## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THURMAN WILLIAMS
2844 Langston Place SE
Washington, DC 20020

RONALD IAN BOATRIGHT
2844 Langston Place SE
Washington, DC 20020

each individually and on behalf of all
others similarly situated,

PLAINTIFFS,

v.

FEDERAL BUREAU OF PRISONS
320 First Street, NW
Washington, DC 20534

MICHAEL CARVAJAL, in his official
capacity as Director, Federal Bureau of
Prisons

DISTRICT OF COLUMBIA
c/o Office of Attorney General
441 4th Street, NW
Washington, DC 20001

QUINCY BOOTH, in his official
capacity as Director, D.C. Department of
Corrections

HOPE VILLAGE, INC.,
2840 Langston Place SE
Washington, DC 20020

DEFENDANTS.

**Civil No.** 1:20-cv-890

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY
## RELIEF AND CLASS PETITION FOR WRITS OF HABEAS CORPUS

Plaintiffs Thurman Williams, and Ronald Ian Boatright, each individually and on behalf

of all others similarly situated, respectfully complain as follows against Defendants Federal

Bureau of Prisons ("BOP"), Michael Carvajal, Director of the BOP, District of Columbia,

Quincy Booth, Director of the District of Columbia Department of Corrections, and Hope

Village, Inc.

## INTRODUCTION

1.      This class action is being filed, in the midst of a massive global health emergency, on

behalf of all persons incarcerated by the District of Columbia and the Federal Bureau of Prisons

at the Hope Village halfway house in Washington, D.C.

2.      Hope Village is the largest federal halfway house in the country, with approximately 300

beds.  It is the only federally contracted halfway house for men in the District of Columbia.

Hope Village houses mainly federal prisoners who are about to be released. During normal

operations, prisoners come and go during the day for jobs and training, to look for work, to

obtain medical care, to visit family, and for other necessities.

3.      As of March 31, 2020, there were 163,539 cases and almost 3,000 deaths attributable to

COVID-19 reported in the United States. That number grows daily. The District of Columbia has

reported 495 cases of COVID-19 and at least 9 deaths, as of March 30, 2020. According to the

World Health Organization, as of March 23, more than 332,900 people have been diagnosed

with COVID-19 in 190 countries or territories around the world and 14,510 have died as a result.

At least six prisoners have tested positive at the DC Jail.

4.      The Center for Disease Control and Prevention ("CDC") and other public health experts

have advised that the best method to limit transmission of the virus is to avoid gatherings and

practice "social distancing."[1] Health experts recommend a minimum of six feet between people,

limited contact, and meticulous personal hygiene.

---

[1] Center for Disease Control, Interim Guidance on Management of Coronavirus Disease
2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020)

5.      It is the policy of the District of Columbia to require social distancing and to prohibit

people gathering in groups. The Mayor has issued a series of Executive Orders that carry the

force of law and include criminal penalties for those who do not follow these basic public health

practices.[2] The Mayor's orders relied, in part, on the following findings:

> This Order is issued based on the increasing number of confirmed
> cases of COVID-19 within Washington, DC, and throughout the
> metropolitan Washington region. Scientific evidence and public
> health practices show that the most effective approach to slowing
> the community transmission of communicable diseases like
> COVID-19 is through limiting public activities and engaging in
> social distancing. …   Medical and public health experts agree that
> COVID-19 is easily transmitted and it is essential that its spread be
> slowed to protect the ability of public and private health care
> providers to handle the expected influx of ill patients and safeguard
> public health and safety. …. Because of the risk of the rapid spread
> of the virus, and the need to protect all members of Washington,
> DC, and the region, especially residents most vulnerable to the
> virus, and local health care providers and emergency first
> responders, this Order requires the temporary closure of the on-site
> operation of all non-essential businesses and implements a
> prohibition on large gatherings.[3]

6.      Contrary to District of Columbia policy and despite this guidance and the spreading

pandemic, Defendants have forced prisoners at Hope Village to sleep in close quarters and bunk

beds, about three feet apart.  The prisoners eat together in crowded dining rooms and share

bathrooms.

7.      The prisoners are also forced to clean the facilities themselves.  Defendants do not

provide adequate basic cleaning services.  Further, Defendants have failed to provide prisoners

with the most basic supplies to clean their living areas or maintain the rigorous personal hygiene

the CDC is urging.

---

[2] https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order
[3] https://coronavirus.dc.gov/release/mayor-bowser-orders-closure-non-essential-businesses

8.      Typically, prisoners at Hope Village are allowed to leave the facility during the day for a job or to visit family.  But Defendants suspended this freedom and have refused to release prisoners to live with their families or in their homes during this unprecedented and immediate health emergency.

9.      The conditions maintained by Defendants in Hope Village make it impossible for the prisoners and pre-trial detainees housed there to avoid congregating in groups or practice social distancing, maintain the required hygiene and limit the high risk of spread of the COVID-19 virus.

10.     Furthermore, Defendants have failed to provide even the most basic medical care during this health emergency.   Hope Village has failed to provide prompt medical attention and testing to those with COVID-19 symptoms.  Hope Village also does not have an on-site medical staff. Prisoners at Hope Village who are ill have been forced in recent days to call 9-1-1 themselves for help.

11.     Defendants cannot keep the prisoners safe from the COVID-19 pandemic while housing them in group bunk rooms and tight living quarters without adequate sanitation, and while providing little or no medical care.

12.     Defendants' continued inaction gravely jeopardizes the safety and lives of all Plaintiffs and approximately 300 other prisoners confined to Hope Village, as well as the staff and the public.

13.     Many of the people at Hope Village have been designated for home confinement by the BOP and are typically eligible for release on home confinement within 6 months of their release date.

14.     Defendants have refused to exercise their discretion to provide early release and significantly reduce the population in the facility.  Instead, Defendants have chosen to keep prisoners confined in tight quarters as the COVID-19 crisis spreads like wildfire.  The continued incarceration of the Plaintiffs at Hope Village in conditions that contravene widely known health protocols is putting them, Hope Village staff, and the broader community at great risk for infection, illness, or death due to the COVID-19 pandemic.

15.     The CDC guidelines are incorporated in the guidelines published on March 20, 2020, by the American Jail Association.[4] These guidelines recommend reducing jail populations as soon as possible, including by releasing inmates when at all possible. The guidelines also state that any new prisoners should be screened for COVID-19, as should facility staff on a daily basis.

16.     The American Jail Association guidelines also implore correctional facilities to "provide free and readily available soap, hand sanitizer, and cleaning/disinfectant supplies for living areas." The guidelines state to replenish those supplies frequently and eliminate rules that label the products contraband. The guidelines suggest adding additional hand washing stations.

17.     When discussing social distancing, the American Jail Association guidelines recommend serving food in housing units instead of having prisoners travel and congregate in dining halls. The guidelines also generally call for reducing activities that cause prisoners to congregate in large groups.

18.     Health experts have warned that there is an increased risk of contracting and transmitting COVID-19 when groups of people live, eat, and sleep in close proximity.

19.     In response to this guidance, jurisdictions around the world and in the United States have taken bold actions to save lives for inmates and for the community. Germany released "1,000

---

[4] American Jail Association, Recommended Strategies for Sheriffs and Jails (March 20, 2020).

prisoners who are close to the end of their sentences"; Canada released "1,000 inmates in the

state of Ontario"; and Iran "temporarily release[d] 85,000 prisoners, with 10,000 of them being

granted pardons."[5] The New Jersey Supreme Court announced that it would release "as many as

1,000 people from its jails"[6] and New York City is releasing more than 1,000 people from its

jails.[7] This effort to downsize facilities like prisons and jails, which are breeding grounds for the

highly contagious virus, is not limited to the East Coast. It is an urgent nationwide effort.

Cuyahoga County, Ohio, announced plans to rapidly release around 600 people from the county

jail just two days after President Trump declared a national emergency; Washington County,

Oregon, released more than 120 people from the local jail; Alameda County, California, released

314 people from their jail; the Iowa Department of Corrections began to release 700 people from

state prisons; Mercer County, Pennsylvania, released 60 of 308 people in their jail.[8]  Despite

such actions around the country, the District of Columbia and BOP have failed to act.

20.     Given the size of the current population inside Hope Village and the structure of the

living arrangements, the facility simply cannot provide the safety and COVID-19 protection that

is constitutionally mandated under the Eighth Amendment.

21.     Because of Defendants' continuing violations of Plaintiffs' constitutional rights, Plaintiffs

seek class-wide relief requiring Defendants to join other jurisdictions in reducing the population

---

[5]  Michael Nienaber et al., Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of Prisoner Releases, REUTERS, March 25, 2020.
[6] Tracey Tully, 1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk, N.Y. TIMES, March 23, 2020.
[7]  NYC to Release More Than 1,000 Prison Inmates Due to Coronavirus Concerns, ASSOC. PRESS, March 25, 2020.
[8] Kimberly Kindy et al., 'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat, WASH. POST, March 25, 2020.

of Hope Village and to implement other basic health and safety policies and procedures that would mitigate the risk to Plaintiffs.

Plaintiffs therefore ask this court for declaratory and injunctive relief, including requiring Defendants to: release enough people such that the remaining people can be housed safely and in compliance with CDC guidance at Hope Village; and provide living, dining and sleeping arrangements that permit social distancing for those prisoners who remain at Hope Village.

## JURISDICTION

22.     This Court has subject matter jurisdiction over the allegations presented herein pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. §§ 2201-02 (declaratory relief), and 28 U.S.C. § 2241 (habeas jurisdiction).  Plaintiffs' claims under the common law of the District of Columbia arise from the same events as the federal claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiffs' claim occurred or will occur in the District of Columbia.

## PARTIES

### PLAINTIFFS

24.     Mr. Thurman Williams is a 49-year-old man. He has been at Hope Village since February 18, 2020.

25.     Mr. Williams has already served all of his 30 year prison sentence Mr. Williams becomes eligible for home confinement on June 17, 2020. Mr. Williams will be released on parole on

December 17, 2020. He was transferred to Hope Village from Federal Correctional Institution – Schuykill.

26.     Mr. Williams lives in a room at Hope Village in Building 50 with several other men. There are about 70 total prisoners in Building 50—including a resident who has reportedly tested positive for COVID-19.

27.     Once released, Mr. Williams plans to live in District Heights, Maryland. During this extraordinary time, Mr. Williams would be safer living with his family instead of being crammed into small spaces with other prisoners of Hope Village.

28.     Mr. Ronald Ian Boatright is a 36-year -old man confined to Hope Village. Despite the fact that Mr. Boatright became eligible for home confinement on March 13, 2020, Mr. Boatright was transferred from Federal Correctional Institution – Sheridan ("FCI Sheridan") to Hope Village on March 16, 2020. Mr. Boatright's release date is set for September 13, 2020.  Mr. Boatright has a residence outside of Hope Village where he will stay.

29.     In mid-February, prior to his transfer from FCI Sheridan, Mr. Boatright fell ill.  Many prisoners at FCI Sheridan were sick with flu-like symptoms at the time. Mr. Boatright experienced shortness of breath, coughing, stomach pain, fever, hot flashes, and dizziness.

### DEFENDANTS

30.     Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice and is responsible for the administration of federal prisons, and certain halfway houses, including Hope Village. BOP maintains physical custody of Plaintiffs.

31.     Defendant District of Colombia oversees the D.C. Department of Corrections (DOC), an agency responsible for ensuring public safety for citizens. DOC's mission is the ensure public

safety by providing "orderly, safe, secure, and humane environment for the confinement of pretrial detainees and sentenced inmates."

32.     Defendant Quincy Booth is the Director of the DOC.  He is sued in his official capacity.

33.     Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued in his official capacity.

34.     Defendant Hope Village, Inc., is a privately owned halfway house in Washington, D.C. Hope Village has contracts with both the BOP and the DOC to provide housing and care to the plaintiffs and others similarly situated. Hope Village houses both persons who have been released from federal correctional facilities, persons awaiting trial in the District, and or persons convicted of misdemeanors in the District.

## FACTUAL BACKGROUND

### COVID-19 Presents A Serious Risk of Harm in the Criminal Justice System

35.     Outcomes from COVID-19 vary from asymptomatic infection to death. Some individuals who contract the disease may experience mild symptoms, while others may suffer respiratory failure and death. People with pre-existing medical conditions, such as asthma, kidney disease, heart disease, obesity, and diabetes, are at an increased risks of having- serious complications if they contract COVID-19.

36.     In the highest risk populations, the fatality rate is about 15 percent, meaning that out of 100 vulnerable people infected, fifteen (or approximately 1 in 7) will die.

37.     Those who do not die may experience long-term harm. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.

38.     Research shows that avoiding groups and social distancing is a critical means of risk mitigation. Distancing must occur before individuals display symptoms, as they may be contagious before they are symptomatic. The CDC recommends a social distance of *at least* 6 feet to minimize the risk of spread.  This CDC guidance extends this to correctional facilities: prisoners' beds should be at least 6 feet apart.

39.     Given the nature of congregation in detention facilities, there is an increased risk that COVID-19, a highly contagious disease, will spread more quickly to a larger number of people. This Court has already recognized that the risk of spreading the virus in jail is "palpable" and risks overburdening the healthcare resources of the facility and the surrounding community.[9] Given this inherent danger, courts around the country, including the District of Columbia, have released people from incarceration due to concerns about COVID-19.[10]

### Conditions in Hope Village Halfway House

40.     The conditions in Hope Village facilities disregard all medical and public health directives for risk mitigation. Hope Village does not encourage or practice social distancing in its facilities. Furthermore, the structure and layout of Hope Village makes social distancing impossible.

41.     There are many opportunities for the virus to enter Hope Village.

---

[9] *U.S. v. Jaffee*, No.19-cr-88-RDM (D.D.C. Mar. 26, 2020)

[10] 106 people who were incarcerated on Rikers Island for Technical Parole Violations were ordered to be released on March 27, 2020 (see https://legalaidnyc.org/wp-content/uploads/2020/03/03-27-20-Secures-Release-of-106-Incarcerated-New-Yorkers-at-a-high-risk-of-COVID-19-from-Technical-Parole-Violation-Holds-on-Rikers-Island.docx.pdf?fbclid=IwAR3IvbeyQ1BdlVdnwjsZjVd_S71X06pp-uQAyGK2vUj7n2XpOa5URMPyZfQ; A defendant with a history of gun and drug charges was released to home confinement due to concerns related to COVID-19 spread. *U.S. v. Jaffee*, No. 19-cr-88-RDM (D.D.C. Mar. 26, 2020); A defendant convicted of child pornography charges was released to home confinement due to concerns related to COVID-19 spread. *U.S. v. Harris*, No.19-cr-356-RDM, Dkt. No. 36 (D.D.C. Mar. 26, 2020).

42.     Although prisoners are currently not allowed to leave Hope Village, Hope Village still is admitting new prisoners.  The CDC guidelines recommend screening for any new prisoners to detect potential COVID-19 symptoms.

43.     Defendants have admitted new individuals and prisoners without screening.  This creates a heightened risk that the virus will be introduced into the facility.

44.     Defendants are not screening staff each day.  This presents a daily risk of introduction of the virus into Hope Village's facility.

45.     On March 20, 2020, Hope Village issued a shelter in place order for all prisoners. This order has exacerbated crowded conditions at Hope Village, because all of the prisoners must stay in the facility at all times.

46.     Prisoners in Hope Village live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19.  Prisoners in Hope Village share apartments.  Each apartment has two bedrooms, each of which houses four prisoners who sleep in bunk beds roughly 3 feet apart.  Each apartment has only one bathroom that is shared among all the men assigned to that apartment.

47.     The CDC recommended that correctional facilities provide no-cost access to soap, running water, and tissues to all prisoners.

48.     Prisoners in Hope Village have limited access to hot water, soap, disinfectants, gloves, and masks. Hope Village has not provided hygiene and cleaning supplies to people incarcerated there.  Prisoners are responsible for purchasing their own hygiene supplies, but there is no

commissary at the facility.  Since the lockdown of the facility began on March 20, 2020,

prisoners have to rely on family, if they have family in the area, to drop off hygiene supplies.[11]

49.     Prisoners are responsible for cleaning and sanitizing their own apartments and common

areas, including the shared bathrooms.

50.     They frequently lack adequate cleaning supplies to do so.

51.     Prisoners report that the cleaning supplies are not readily available and those that are

available are watered down.

52.     Lysol and alcohol-based cleaning supplies are not permitted because they are considered

contraband.

53.     No hand sanitizer is available to people incarcerated at Hope Village because it is

considered contraband.

54.     Tissues are not readily available.

55.     According to Hope Village, toilet paper is distributed twice a week.[12]

56.     Hallways also pose risks of contagion:  prisoners share the hallways, and everyone,

including quarantined individuals, use the hallway to access services.

57.     Hope Village's dining facilities preclude the CDC-recommended social distancing and

increase transmission opportunities.  Prisoners at Hope Village eat meals in large groups of about

---

[11] District of Columbia Corrections Information Council, CIC Visit to Hope Village on Thursday March 26, 2020, at 5, *available at* https://cic.dc.gov/sites/default/files/dc/sites/cic/release_content/attachments/Now%20Hope%20Village%20CIC%20Statement%203_27_20%20-compressed.pdf

[12] District of Columbia Corrections Information Council, CIC Visit to Hope Village on Thursday March 26, 2020, at 3, *available at* https://cic.dc.gov/sites/default/files/dc/sites/cic/release_content/attachments/Now%20Hope%20Village%20CIC%20Statement%203_27_20%20-compressed.pdf

20-25 people at any given time.[13]  Five people must sit at each of five or six round tables, which are approximately 5 feet in diameter.[14]  People eat from open trays in these crowded spaces. Additionally, prisoners take their silverware from an open communal box.

58.     The dining area is not in the same buildings in which prisoners live.  Consequently, on the way to the dining hall, prisoners must touch or open doors that are touched by many other prisoners.  There is no sink in the dining area, so prisoners have no means to wash their hands before they eat and after touching doors that they needed to open on the way to the dining area.

59.     When Hope Village suspects someone may have contracted COVID-19, Hope Village places that person in isolation by assigning the person to an apartment without roommates.

60.     The quarantined person continues to share hallways with the rest of the residents living in the building.  Staff bring food trays to quarantined residents.

61.     One person who was recently released from isolation was told he cannot remain living in the apartment by himself.  Instead, Hope Village required him to move into an apartment with 6 other men. He now shares a bedroom with 3 other men.

62.     Hope Village has not educated prisoners on ways to minimize community spread of COVID-19.

63.     Hope Village does not have on-site medical staff.  Prisoners receive medical treatment only if they are sent by ambulance to a hospital.

64.     Hope Village has not informed the population of any protocol for isolating symptomatic prisoners.

---

[13] District of Columbia Corrections Information Council, CIC Visit to Hope Village on Thursday March 26, 2020, at 3, *available at* https://cic.dc.gov/sites/default/files/dc/sites/cic/release_content/attachments/Now%20Hope%20Village%20CIC%20Statement%203_27_20%20-compressed.pdf
[14] *Id.*

65.     These crowded conditions, in both sleeping and social areas, and the shared bathrooms

maximize the likelihood that COVID-19 will spread rapidly across the facilities, infecting

vulnerable detainees.

66.     The conditions in Hope Village are dire. They are contrary to CDC guidance and BOP

guidelines.  Defendants have created a significant and immediate risk of spreading COVID-19,

putting the prisoners health and lives in danger.

**Hope Village Continues to Expose Plaintiffs to Dangerous Conditions of Confinement**

**Despite Being Advised of These Dangers**

67.     Public health measures across the country demonstrate the widespread recognition that

protecting individuals from potentially serious illness or death from COVID-19 requires practice

social distancing and increased hygiene.

68.      On March 23, 2020 the Center for Disease Control issued the Interim Guidance on

Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.

The guidance specifically recommends implementing social distancing strategies to increase the

physical space between people, "ideally 6 feet between all individuals, regardless of the presence

of symptoms"

69.     The University of Texas at Austin's Lyndon B. Johnson School of Public Health, issued

Recommended Strategies For Sheriffs And Jails To Respond To The Covid-19 Crisis. The

guidance includes suggestions for ensuring safe practices within the prisoner population to

reduce the risk of COVID-19. In particular, it suggests reducing the prisoner population,

implementing screening measures, providing free  hygiene products for living areas,

communicating information to prisoners on the symptoms and risks of COVID-19 as well as

ways to prevent its spread, and responding swiftly to any cases.

70.     The CDC guidance also states that facilities should "ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility." The CDC lists cleaning supplies, soap, and daily medical supplies as supplies that should be within the facility.

71.     The Federal Bureau of Prisons began preparing for COVID-19 response in January 2020, including issuing guidance to screen inmates and staff. BOP's COVID-19 guidance was shared with private prisons and RRCs for dissemination to staff and inmates in these facilities, so that similar protocols can be implemented. The BOP states that facilities should be screening all newly-arriving prisoners for COVID-19, asymptomatic inmates with exposure risk factors should be quarantined, symptomatic inmates with exposure risk factors should be isolated.

72.     BOP also stated that they would "implement nationwide modified operations to maximize social distancing and limit group gathering in our facilities" The guidance suggested staggering meal times.

73.     BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.  BOP has discretion to place prisoners on home confinement or furlough.

74.     Hope Village detains all prisoners in contradiction of CDC and BOP guidance.

75.     Hope Village has also tried to silence the prisoners' cries for help.   Staff of Hope Village threatened prisoners with discipline for rioting, if they tried to speak with District of Columbia Councilmember Trayon White about the conditions at Hope Village when he came to visit.

# LEGAL FRAMEWORK

## Plaintiffs Have a Constitutional Right to Reasonable Safety in Confinement.

76.    The Eighth Amendment prohibits cruel and unusual punishments.  U.S. Const. Amend. VIII.

77.    The government has an affirmative duty to provide conditions of reasonable health and safety when it detains or incarcerates them. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).

78.    The reach of the Eighth Amendment includes "exposure of inmates to serious, communicable disease." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

79.    The Eighth Amendment requires that "inmates be furnished with … reasonable safety and the Supreme Court has explicitly recognized that the risk of contracting "serious contagious diseases" may constitute such an "unsafe, life-threatening condition" that it threatens reasonable safety." *Id.*.A potential COVID-19 outbreak poses a substantial risk of serious harm to every person housed in Hope Village.

80.    The risk of exposure to COVID-19 constitutes a serious risk to health. Under the current conditions in Hope Village, Defendants have not and cannot protect Plaintiffs from the risk of this serious harm.

81.    Defendants have acted with deliberately indifference to the needs of the plaintiffs, by, *inter alia:*

      a.   Ignoring conditions that are very likely to cause serious illness such as: crowded dining rooms, crowded sleeping quarters, lack of access to cleaning products, lack of access to products to maintain personal hygiene.

b.  Ignoring CDC and BOP guidelines about posting signage to educate prisoners about COVID-19, its symptoms, and preventative measures.

c.  Ignoring CDC guidelines and professional guidance to create social distance of about six feet between persons to help stop the spread of COVID-19.

d.  Continuing to admit new prisoners.

e.  Failing to test newly admitted individuals.

f.  Failing to screen prisoner personnel as they enter the facility on a daily basis.

g.  Not having an on-site medical staff to address health concerns as they arise during a global pandemic.

**Defendants Have Breached Their Duty of Care Owed to the Prisoners Resulting in Harm**

82.   As penal authorities, Defendants owe a duty to provide reasonable care to the prisoners in their protection and safekeeping. *Matthews v. District of Columbia*, 387 A. 2d 731, 734 (D.C. 1978).

83.   Defendants knew of the dangers associated with COVID-19 and failed to mitigate the risks. The BOP issued guidance to their facilities on how to deal with COVID-19.

84.   Defendants breached that duty by, *inter alia,* failing to provide care consistent with directives from the CDC and BOP.  For example, Hope Village failed to:

a.   Provide prisoners with the opportunity to practice social-distancing, including by staggering meal times, or confining less people to one apartment.  Hope Village continues to feed 25-30 prisoners at a time in a common area. Prisoners have to sit five to a table. The tables only have a five foot diameter making it impossible for the recommended six feet for social distancing. Prisoners have to sleep in bunk beds that are very close together.

b.   Provide sanitary conditions and supplies to maintain good hygiene.

c.   Stop admitting new prisoners or at the very least screen incoming prisoners for COVID-19 symptoms before admission.

d.   Screen Hope Village staff as they enter the facility on a daily basis.

e.   Follow CDC and BOP guidelines about posting signage to educate prisoners about COVID-19, its symptoms, and preventative measures.

f.   Have medical staff on-site to address health concerns as they arise during a global pandemic.

85.   Hope Village's failures have caused plaintiffs to suffer increased risk of harm and have increased the threat from existing conditions.

## CLASS ALLEGATIONS

86.   Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2). For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the class, as defined below.

87.     Plaintiffs bring this action on behalf of the following class: All persons who were, as of the filing date of the complaint in this case, or will be in the future, confined in Hope Village.  Plaintiffs reserve the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

88.     Class action status for this litigation is proper under Rule 23(b)(2) because:

    a.    The class is so numerous that joinder is impracticable. Based upon information and belief, the size of the class is approximately 200 people and is therefore so numerous that joinder is inherently impracticable for that reason alone. Joinder is also impracticable for other, independent reasons. Proposed class members are highly unlikely to file individual suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel due to Defendants' policies, are currently incarcerated, fear retaliation from filing suits against Defendants, and lack access and financial resources to obtain qualified counsel to bring such suits.

    b.    The claims of the class share common issues of fact and law, including but not limited to whether Defendants' policies regarding health and hygiene as relevant to the COVID-19 pandemic — policies that systemically affect all proposed class members — violate the Eighth Amendment to the United States Constitution. The resolution of this question will drive the outcome of the litigation.

    c.    The claims of Plaintiffs are typical of those of the class as a whole, because each Plaintiff is currently in Defendants' custody and Plaintiffs' claims arise from the same policies and procedures (or lack thereof) that provide the basis for all proposed class members' claims.

      d.   Plaintiffs are adequate class representatives who meet all of the requirements of Rule

         23(a)(4). They have no conflicts of interest in this case with other class members. They

         will fairly and adequately represent the interests of the class, and each understands the

         responsibilities of a representative. Counsel for Plaintiffs will vigorously prosecute the

         interests of the class and include attorneys with extensive experience with the factual and

         legal issues involved in representing jail and prison inmates, in asserting constitutional

         rights, and/or in pursuing class actions.

89.    Defendants have acted and/or refused to act on grounds generally applicable to the class,

thereby making final declaratory and injunctive relief appropriate with respect to the class as a

whole under Federal Rule of Civil Procedure 23(b)(2).

## CAUSES OF ACTION

### Claim I: Violation of Eighth Amendment

(against Defendants Federal Bureau of Prisons and Carvajal)

90.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though

fully set forth herein.

The Eighth Amendment guarantees post-conviction detainees the right to reasonable safety.  The

Government's failure to provide a safe environment during a widespread outbreak of a

contagious disease constitutes deliberate indifference to the health and safety of persons at Hope

Village, thereby establishing a violation of the Eighth Amendment.

91.    Defendants have failed to provide adequate protections at Hope Village, where Plaintiffs

are not able to take steps to protect themselves through social distancing and other guidelines set

by the CDC. Furthermore, Hope Village is not taking precautions to protect persons housed from

the threat of the virus coming into the facility from guards who come in and out of Hope Village

daily. As COVID-19 rapidly spreads throughout the country, the already unsafe conditions at Hope Village will be intensified, and the ability to protect oneself will become even more impossible.

92.     Defendant's failure to adequately protect Plaintiffs' constitutes a violation of their Eighth Amendment rights.

93.     Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr.*, *Inc.*, 575 U.S. 320, 327 (2015).

## Claim II: Violation of Eighth Amendment Rights / 42 U.S.C. § 1983

(against Defendants District of Columbia and Booth)

94.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

95.     Section 1983 provides that "every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subject or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution…shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

96.     By failing to provide adequate conditions in the midst of a global health pandemic, Defendant District of Columbia has violated Plaintiffs' Eighth Amendment rights for the same reasons alleged in Claim I.

## Claim III: Negligence

(against Defendant Hope Village, Inc.)

97.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

98.     Defendant Hope Village, Inc., via its employees and agents, is well aware of the danger of COVID-19.

99.     Hope Village owes a duty of care to Plaintiffs and breached that duty by failing to respond to the danger of COVID-19 by providing adequate conditions for prisoners.

100.    Hope Village's breach has caused the plaintiffs harm by exposing them to a serious risk of great harm and death.

## PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

101.    Certify the class of all current and future residents of Hope Village.

102.    Issue a declaration that the conditions to which Plaintiffs are subjected at Hope Village place Plaintiffs at an unreasonable risk of contracting serious illness.

103.    Issue an injunction requiring that Defendants address the inadequate conditions at Hope Village. The injunction should require:

   a.   That Defendants release enough people such that the remaining people can be housed safely and in compliance with CDC guidance at Hope Village;

   b.   That Defendants take appropriate sanitary measures, including, *inter alia*:

      i.   Clean the prisoners' rooms daily;

      ii.  Reduce the number of people at each meal time to facilitate social distancing pursuant to CDC guidelines;

      iii. Reduce the number of prisoners sharing bedrooms to facilitate social distancing pursuant to CDC guidelines;

      iv.  Reduce the number of prisoners sharing bathrooms to ensure good hygiene;

      v.  Provide products for prisoners to maintain a clean space and ensure good personal hygiene; and

      vi.  Ensure food safety, including ensuring that persons handling the food have been tested or screened for COVID-19 symptoms.

  c.  That Defendants stop admitting new prisoners to Hope Village;

  d.  That Defendants provide an on-site medical team;

  e.  That defendants screen staff and any person for COVID-19 symptoms upon every entry into the facility;

  f.  That Defendants screen any and every prisoner who complains of COVID-19 symptoms for the virus. Defendants should also implement isolations and quarantines when necessary; and

  g.  That Defendants follow CDC and BOP guidelines and post signage to alert prisoners to the symptoms of COVID-19, and ways to prevent the spread of the virus.

104.    Issue a Writ of Habeas Corpus and order the immediate release of Plaintiffs and sufficient members of the Plaintiff Class to ensure that the remaining residents can effectively practice social distancing and safe sanitation measures, with appropriate precautionary public health measures, on the ground that their continued detention violates their constitutional rights;

105.    In the alternative, issue injunctive relief ordering all Defendants to immediately release Plaintiffs, with appropriate precautionary public health measures, on the grounds that their continued detention violates their constitutional rights;

106.    Award Plaintiffs their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, The Civil

Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, and on any other basis justified under law; and

107.    Grant any and all other such relief that this Court deems just and equitable.


Dated: April 2, 2020                         Respectfully submitted,

                                             /s/ Kevin Metz
                                             Kevin Metz (D.C. Bar # 494087)
                                             Drew Wisniewski (D.C. Bar # 1016351) (pro
                                             hac vice pending)
                                             Clayton LaForge (D.C. Bar # 1033938)
                                             **LATHAM & WATKINS LLP**
                                             555 Eleventh Street NW, Suite 1000
                                             Washington, DC  20004
                                             Tel:  (202) 637-2200
                                             kevin.metz@lw.com
                                             clayton.laforge@lw.com

                                             Jonathan Smith (D.C. Bar # 396578)
                                             Emily Gunston (D.C. Bar # 1032056) (pro
                                             hac vice pending)
                                             Lyndsay A. Niles (D.C. Bar # 1003427) (pro
                                             hac vice pending)
                                             **WASHINGTON LAWYERS' COMMITTEE FOR
                                             CIVIL RIGHTS & URBAN AFFAIRS**
                                             11 Dupont Circle, NW, Suite 400
                                             Washington, DC 20036
                                             jonathan_smith@washlaw.org

                                             Scott Michelman (D.C. Bar # 1006945)
                                             Arthur B. Spitzer (D.C. Bar # 235960)
                                             Michael Perloff (D.C. Bar # 1601047)
                                             **ACLU FOUNDATION OF THE
                                             DISTRICT OF COLUMBIA**
                                             915 Fifteenth Street NW, Second Floor
                                             Washington, DC 20005
                                             Tele: (202) 457-0800
                                             artspitzer@gmail.com
                                             smichelman@acludc.org
                                             mperloff@acludc.org

*Attorneys for Plaintiffs*