**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THURMAN WILLIAMS, et al.,

                Plaintiffs-Petitioners,

       v.

FEDERAL BUREAU OF PRISONS, et al.,

           Defendants-Respondents.

**Civil No.** 1:20-cv-890

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ..........1

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

I.      The COVID-19 Pandemic........................................................................................3

II.     The Virus Poses Particular Risks in the Correctional Environment .......................5

III.    The Conditions at Hope Village ..............................................................................8

LEGAL STANDARD..........................................................................................................12

ARGUMENT .......................................................................................................................13

IV.     Plaintiffs are Likely to Succeed on the Merits of Establishing a Constitutional
        Violation and Negligence. .......................................................................................13

        A.      The Governmental Defendants' Deliberate Indifference to Plaintiffs'
                Health and Safety Violates Plaintiffs' Eighth Amendment Rights.....................14

                1.      Plaintiffs' conditions of confinement are sufficiently serious as to
                        pose a substantial risk of serious harm by exposing them to an
                        infectious disease. ...................................................................................14

                2.      The governmental defendants continue to show deliberate
                        indifference to the substantial risk of harm that COVID-19 poses to
                        Plaintiffs..................................................................................................16

        B.      Hope Village has Breached its Duty of Care Owed to the Prisoners,
                Resulting in Harm. ...........................................................................................20

V.      There is a Strong Public Interest in Minimizing the Spread of COVID-19 through
        Social Distancing and Hygiene Practices that are Impossible at Hope Village................25

VI.     The Balance of Equities Favors an Improvement in Conditions in Hope Village,
        Including Depopulation. ...........................................................................................26

CLASS ALLEGATIONS ....................................................................................................29

CONCLUSION....................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2009) ............................................................................12

*Abdullah v. Bush*,
    945 F. Supp. 2d 64 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753
    F.3d 193 (D.C. Cir. 2014) .....................................................................................13

*Aracely R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) .......................................................................27

*Austin v. Pa. Dep't of Corr.*,
    No. 90-7497, 1992 WL 277511 (E.D. Pa. Sept. 29, 1992) ....................................24

*Baker v. Sard*,
    420 F.2d 1342 (D.C. Cir. 1969) ............................................................................12

*Bame v. Dillard*,
    No. 05-cv-1833, 2008 WL 2168393 (D.D.C. May 22, 2008) ................................29

*Boone v. Brown*,
    No. Civ. 05-0750(AET), 2005 WL 2006997 (D.N.J. Aug. 22, 2005) ...................24

*Brown v. Plata*,
    563 U.S. 493 (2011) ..............................................................................................12

*Busby v. Capital One, N.A.*,
    772 F. Supp. 2d 268 (D.D.C. 2011) ......................................................................20

*Caldwell v. Dist. of Columbia*,
    201 F. Supp. 2d 27 (D.D.C. 2001) ........................................................................14

*Castillo v. Barr*,
    No. 20-cv-605 (TJH) (C.D. Cal. Mar. 27, 2020) ..................................................28

*Chang v. United States*,
    217 F.R.D. 262 (D.D.C. 2003) ..............................................................................29

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................................12

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    319 F. Supp. 3d 70 (D.D.C. 2018), *rev'd on other grounds*, 944 F.3d 945
    (D.C. Cir. 2019) .....................................................................................................12

*Elrod v. Burns*,
   427 U.S. 347 (1976) (plurality opinion) ...............................................................25

*In re Extradition of Toledo Manrique*,
   No. 19-mj-71055-MAG-1 (TSH), (N.D. Cal. Mar. 19, 2020) ....................................1

*Farmer v. Brennan*,
   511 U.S. 825 (1994).............................................................................14, 16, 17

*Farmer v. Moritsugu*,
   163 F.3d 610 (D.C. Cir. 1998) ..............................................................................16

*Feirson v. D.C.*,
   362 F. Supp. 2d 244 (D.D.C. 2005), *aff'd*, 506 F.3d 1063 (D.C. Cir. 2007).........................20

*Fraternal Order of Police Library of Congress Labor Comm. v. Library of Congress*,
   639 F. Supp. 2d 20 (D.D.C. 2009) ........................................................................23

*Harris v. Bd. of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ................................................................................27

*Helling v. McKinney*,
   509 U.S. 25 (1993)........................................................................14, 15, 16, 24

*Hickey v. Wash. Metro. Area Transit Auth.*,
   360 F. Supp. 2d 60 (D.D.C. 2004) ........................................................................21

*Hutto v. Finney*,
   437 U.S. 678 (1978)...............................................................................12, 15

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996)...................................................................................24

*Jones v. Hurwitz*,
   324 F. Supp. 3d 97 (D.D.C. 2018) ........................................................................16

*Jones v. Tex. Dep't of Criminal Justice*,
   880 F.3d 756 (5th Cir. 2018) ................................................................................24

*Kifafi v. Hilton Hotels Retirement Plan*,
   189 F.R.D. 174....................................................................................................29

*Kirwa v. U.S Dep't of Defense*,
   285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................29

*Mills v. Dist. of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009).............................................................................24

*Morris v. Corr. Corp. of Am.*,
    75 F. Supp. 3d 457 (D.D.C. 2014) ........................................................................20

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................29

*In re Request to Commute or Suspend County Jail Sentence*,
    Case No. 084230 (N.J.S.C. Mar. 22, 2020) ...........................................................28

*In re Request to Commute or Suspend County Jail Sentences*,
    Case No. 84230 (N.J. Mar. 22, 2020) ......................................................................1

*United States v. Bell et al.*,
    No. 1:16-cr-00485-JKB (D. Md. Mar. 19, 2020), Dkt. Nos. 1726-27 ....................28

*United States v. Fellela*,
    No. 3:19-cr-79 (JAM), 2020 U.S. Dist. LEXIS 49198 (D. Conn. Mar. 20,
    2020) .......................................................................................................................28

*United States v. Philip Morris USA, Inc.*,
    449 F. Supp. 2d 988 (D.D.C. 2006) .......................................................................26

*United States v. Stephens*,
    No. 15-cr-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) .......................28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................12

*Women Prisoners of D.C. Dep't of Corr. v. D.C.*,
    899 F. Supp. 659 (D.D.C. 1995) ......................................................................22, 23

## RULES

Fed. R. Civ. P. 23(c)(1) ...................................................................................................29

## TREATISES

Restatement (Second) of Torts § 314A (1965) ................................................................20

## REGULATIONS

67 D.C. Reg. 3106 (March 20, 2020) ................................................................................8

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII.......................................................................................13, 14, 15

iv

# OTHER AUTHORITIES

Antonio Olivo, Ovetta Wiggins, & Fenit Nirappil, *Virginia, Maryland governors warn that hospitals soon may be overwhelmed by surge in coronavirus cases*, WASH. POST (Mar. 27, 2020) ................................................................................................26

Centers for Disease Control and Prevention, *Coronavirus (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/index.html (last visited Apr. 1, 2020) ..........................................................................................................................21

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), How it Spreads,* https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last visited Apr. 1, 2020) ......................................................3

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Mar. 30, 2020) ................................22

Centers for Disease Control and Prevention, Influenza (Flu), *Past Seasons, Table 1: Estimated Influenza Disease Burden by Season* — United States 2010-11 through 2018-19 Influenza Seasons (Jan. 9, 2020), https://www.cdc.gov/flu/about/burden/past-seasons.html ......................................................4

Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (*MMWR*), *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) United States*, February 12-March 16, 2020, (Mar. 26, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm .......................................4

Chuk Goudie et. al.*, Illinois prisoners sick with COVID-19 "overwhelm" Joliet hospital*, ABC CHIC. (Mar. 30, 2020), https://abc7chicago.com/coronavirus-illinois-chicago-cases/6064085/..................................................................................................26

D.C. Inmates in Federal Bureau of Prisons, as Congress Intended, in Light of Coronavirus (Mar. 22, 2020), https://norton.house.gov/media-center/press-releases/norton-urges-department-of-justice-to-apply-first-step-act-to-dc-inmates ...................................................................................................................................18

Department of Corrections: Correction Detention Facility, DC.gov, https://doc.dc.gov/page/correctional-facilities (last visited Mar. 31, 2020) ............................8

*Federal Halfway House Say They Are Stuck Inside Without Essential Supplies*, WAMU 88.5 American University Radio (Mar. 25, 2020), https://wamu.org/story/20/03/25/men-in-d-c-s-federal-halfway-house-say-they-are-stuck-inside-without-essential-supplies/.......................................................11, 17, 19

Government of District of Columbia, Public Safety Agency COVID-19 Case Data: Department of Corrections (Mar. 30, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data.............................6

Jack Moore, *Coronavirus: Maryland announces 1st Covid-19-related death as region sees jump in new cases*, WTOP NEWS (Mar. 18, 2020), https://wtop.com/coronavirus/2020/03/coronavirus-updates-dc-maryland-virginia/ ......................................................................................................7

Jan Ramsen & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail,* N.Y. Times (Mar. 30, 2020) .........................................5

Jenny Gross & Mariel Padilla, *From Flattening the Curve to Pandemic: A Coronavirus Glosssary,* N.Y. Times (Mar. 18, 2020) ..............................4

Johns Hopkins University & Medicine, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited Mar. 31, 2020)............................................3

Justin Moyer and Keith Alexander, *D.C. Council member calls on Federal Bureau of Prisons to address coronavirus concerns at halfway house*, Washington Post (Mar. 26, 2020) ..........................................17

Kailyn Brown et al., *A 25-year-old pharmacy tech dies from coronavirus. It's an urgent warning for young people*, L.A. TIMES (Mar. 30, 2020), https://www.latimes.com/california/story/2020-03-30/25-year-old-dies-coronavirus-warning ......................................................4

Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, WASH. POST (Mar. 29, 2020) ..............................6

Ltr. from Lyndsay Niles, Washington Lawyers' Committee for Civil Rights and Urban Affairs, to Joseph Wilmer, Administrative Director, Hope Village (Mar. 25, 2020), https://www.washlaw.org/wp-content/uploads/2020/03/2020.03.25.Letter-to-Hope-Village-regarding-Coronavirus.pdf .............................................................18

March 27, 2020 Letter *in* Press Release: Norton Calls on Federal Bureau of Prisons to Ensure Hope Village Halfway House Residents Safe During the Coronavirus, The DC Line (Mar. 27. 2020), https://thedcline.org/2020/03/27/press-release-norton-calls-on-federal-bureau-of-prisons-to-ensure-hope-village-halfway-house-residents-safe-during-the-coronavirus/ ...........................................................11

*Mayor Bowser Orders Closure of Non-Essential Businesses* (Mar. 24, 2020), https://coronavirus.dc.gov/release/mayor-bowser-orders-closure-non-essential-businesses..........................................................7, 8

Memorandum from Jon Gustin, Administrator, Residential Reentry Management
　　Branch, to All RRC Contract Providers, *Coronavirus (COVID-19)*
　　*Precautions/Modified Operations for Residential Reentry Centers* (Mar. 24,
　　2020),
　　https://www.bop.gov/coronavirus/docs/memo_modified_rrc_operations_2020
　　0324.pdf ..............................................................................................................17, 21

*Re: CIC Visit to Hop Village on Thursday, March 26, 2020*, DC.gov (Mar. 27,
　　2020), https://cic.dc.gov/node/1469876.................................................................18

Rick Noack et al., *White House task force projects 100,000 to 240,000 deaths in
　　U.S., even with mitigation* efforts, WASH. POST (April 1, 2020),
　　https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-
　　news/?wpmk=1&wpisrc=al_news__alert-
　　national&utm_source=alert&utm_medium=email&utm_campaign=wp_news_
　　alert_revere .............................................................................................................3

Sam Kelly, *Sheriff announces 51 new coronavirus cases at Cook County Jail,
　　raising total to 89*, CHI. SUN TIMES (Mar. 28, 2020),
　　https://chicago.suntimes.com/coronavirus/2020/3/28/21198407/cook-county-
　　jail-coronavirus-covid-19-cases-inmates-89.............................................................6

Sophie Kaplan, *Union vote 'no confidence' in D.C. Jail leaders for handling of
　　Covid-19*, WASH. TIMES (Mar. 20, 2020),
　　https://www.washingtontimes.com/news/2020/mar/20/union-votes-no-
　　confidence-dc-jail-leaders-handling/ .......................................................................7

*U.S. Sees Exponential Growth In Coronavirus Death Toll*, NPR (Mar. 29, 2020),
　　https://www.npr.org/sections/coronavirus-live-
　　updates/2020/03/29/823497607/u-s-sees-exponential-growth-in-coronavirus-
　　death-toll ..................................................................................................................3

WASH. POST, https://www.washingtonpost.com/graphics/local/dc-maryland-
　　virginia-coronavirus-cases/?itid=sf_local (showing that cases in Washington
　　D.C., Maryland, and Virginia have surged from zero cases at the beginning of
　　March to over 4,062 cases by April 1, 2020 and that 82 people in the region
　　have died from the disease) (last visited Mar. 31, 2020)..........................................6

**INTRODUCTION**

COVID-19, the disease caused by the novel coronavirus, is a global pandemic that spreads easily from person-to-person. Custodial living spaces, such as prisons, jails, and especially halfway houses, present particularly serious risks related to COVID-19.  Plaintiffs bring this action on behalf of men who are detained by the U.S. Bureau of Prisons ("BOP") and the D.C. Department of Corrections ("DOC") at Hope Village, a privately-run halfway house for up to 349 men in Washington, D.C. As described below and in the Complaint filed with this Motion, crowding, sanitation and hygiene measures at Hope Village are dangerously inadequate, violate constitutional norms, and fail to comply with the basic medical guidance to mitigate the spread of COVID-19 from the Centers for Disease Control and Prevention ("CDC"), the District of Columbia and the American Jail Association.  Absent emergency steps to reduce the population, improve sanitation and hygiene resources, and enable social distancing, Hope Village presents a urgent risk of a COVID-19 outbreak within its facility, and endangers the lives of not only the detainees, but the staff and surrounding community.

Courts across the country are recognizing the need for relief, and have taken decisive steps in ordering prisons, jails, halfway houses, and other detention facilities to reduce their prisoner populations to slow the spread of the virus. For example, on March 22, 2020, the New Jersey Supreme Court put in place a procedure for the release of 1,000 men and women serving sentences in New Jersey jails. *See* Consent Order, *In re Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020). In another federal case earlier this month, the Northern District of California observed that "the government's suggestion that [the plaintiff] should wait until there is a confirmed outbreak of COVID-19 in [the facility] before seeking release is impractical. By then it may be too late." *In re Extradition of  Toledo Manrique*, No. 19-mj-

71055-MAG-1 (TSH), at *1 (N.D. Cal. Mar. 19, 2020) (citation omitted).  Courts in many other jurisdictions are following suit and ordering the release of detainees, including prisoners in facilities where COVID-19 has not yet appeared.

The Court should join this growing chorus of judges around the country who recognize that this public health crisis demands immediate intervention. For the reasons discussed below, Plaintiffs petition the Court to issue a temporary restraining order followed by a preliminary injunction requiring that Defendants take immediate action to drastically reduce the crowding at Hope Village by releasing prisoners to a level that permits the facility to be run in accordance with all public health guidelines.

The prisoners in Hope Village are in the lowest custodial security status and present a very low risk to public safety. Most are serving the last few months of their sentences before release. The government recognizes as much, because they are already free to be in the community on a daily basis (or they were, until locked down because of the virus). Population reduction can be readily achieved by: (i) promptly releasing to home confinement all individuals with viable options for home confinement; and (ii) to the extent that home confinement release is insufficient to depopulate the facility in a manner that permits appropriate and CDC-recommended social distancing, providing alternative temporary community supervision, the advancement of release dates, furloughs, or other measures.

Further, the Court should mandate that Defendants implement all medically-necessary precautions to ensure the health and safety of its population during the COVID-19 pandemic. These precautions include measures that guarantee detainees have timely access to competent, sufficient, and appropriately qualified staffing, medical care, screening, social distancing

measures, sanitation methods, education, equipment, hospitals, and all other medically necessary protective measures.

## FACTUAL BACKGROUND

### I.     The COVID-19 Pandemic

COVID-19 is an out-of-control global pandemic.  In just the last few days, the number of cases has exploded. As of April 1, 2020 there were more than 932,000 reported COVID-19 cases throughout the world and more than 213,000 cases and 4,700 deaths in the United States.  *See* Johns       Hopkins       University       &       Medicine,       Coronavirus       Resource       Center, https://coronavirus.jhu.edu/map.html (last visited Mar. 31, 2020). The number of cases and deaths is expected to continue to grow exponentially. *See* Meg Anderson, *U.S. Sees Exponential Growth In Coronavirus Death Toll*, NPR (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823497607/u-s-sees-exponential-growth-in-coronavirus-death-toll.       Even given the widespread mitigation efforts currently in place across the nation, the White House Coronavirus Task Force projected on March 31, 2020 that 100,000 – 240,000 Americans will likely die from the virus and, without proper public health strategies and mitigation efforts, 1.5 to 2 million Americans may die. *See* Rick Noack et al., *White House task force projects 100,000 to 240,000 deaths in U.S., even with mitigation* efforts, WASH. POST (April 1, 2020), https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/?wpmk=1&wpisrc=al_news__alert-national&utm_source=alert&utm_medium=email&utm_campaign=wp_news_alert_revere.

There is at present no vaccine or cure for COVID-19.  *See* Ex. 1, Declaration of Dr. Jonathan Giftos ("Ex. 1, Giftos Decl.") ¶ 8.  The disease spreads "easily and sustainably" from person-to-person by respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.  *See* Ex. 1, Giftos Decl. ¶ 4;  Centers for Disease Control and

Prevention, *Coronavirus Disease 2019 (COVID-19), How it Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last visited Apr. 1, 2020).  The virus can be spread by asymptomatic individuals, and scientists estimate that the average infected person spreads the disease to between two and four others. *See* Giftos Decl. ¶ 22; Jenny Gross & Mariel Padilla, *From Flattening the Curve to Pandemic: A Coronavirus Glosssary,* N.Y. Times (Mar. 18, 2020), https://www.nytimes.com/2020/03/18/us/coronavirus-terms-glossary.html.  COVID-19 is also highly fatal; according to the CDC, the disease has an overall case fatality rate of between 1.8-3.4%, many times more deadly than the seasonal flu.  *Compare* Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (*MMWR*), *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) United States*, February 12-March 16, 2020, (Mar. 26, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm *with* Centers for Disease Control and Prevention, Influenza (Flu),  *Past Seasons, Table 1: Estimated Influenza Disease Burden by Season* — United States 2010-11 through 2018-19 Influenza Seasons (Jan. 9, 2020), https://www.cdc.gov/flu/about/burden/past-seasons.html. The virus is particularly dangerous for the elderly and those with underlying health conditions, but is capable of killing or causing serious illness in healthy, young adults as well.  Ex. 1, Giftos Decl. ¶ 13; Kailyn Brown et al., *A 25-year-old pharmacy tech dies from coronavirus. It's an urgent warning for young people*, L.A. Times (Mar. 30, 2020), https://www.latimes.com/california/story/2020-03-30/25-year-old-dies-coronavirus-warning.

As a consequence, the primary focus of the global community is on preventing the spread of the virus.  Ex. 1, Giftos Decl. ¶ 8.  The Centers for Disease Control and Prevention ("CDC") and other public health experts have advised that the best method to limit transmission of the virus

is to practice "social distancing." *Id.* Health experts recommend a minimum of six feet between people, limited contact, avoiding group settings, and meticulous personal hygiene. *Id.* These practices have also been strongly recommended to slow the rate of COVID-19 infections so that hospitals have the resources to address infected individuals with urgent medical needs. *Id.*

## II.     The Virus Poses Particular Risks in the Correctional Environment

Custodial living spaces, such as prisons, jails, and halfway houses, present particularly serious risks related to COVID-19. *See* Ex. 1, Giftos Decl. ¶ 15-40. Unable to comply with the social distancing guidelines discussed above because of their confinement, incarcerated individuals are more vulnerable to contracting the virus because they live with multiple people in close quarters, are regularly required or allowed to inhabit communal spaces for eating and bathing, and are nearly always in close contact with other people. *Id.* In addition, a large number of incarcerated people live with chronic, often untreated illnesses, making them particularly vulnerable to infectious diseases. *Id.* The vulnerability of the incarcerated population compounds the risk to the public health because correctional officers and other staff are coming into and out of the prison and therefore can carry to the outside world any diseases that festered inside. *Id.* ¶¶ 22-23.  Recognizing the heightened risks to this population, the CDC has issued specific guidelines for mitigating COVID-19 in correctional facilities,  recommending social distancing and specific hygiene practices for people in custody.  Giftos Decl. ¶ 9-11.

The risk the disease poses in detention settings is apparent in the dozens of correctional facilities across the country that have reported accelerating outbreaks of the virus within their walls.  For example, as of March 30, 2020, 167 prisoners and 137 staff in New York City jails had tested positive for COVID-19.  *See* Jan Ramsen & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail,* N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.    In    Cook

5

County, Illinois, the number of known detainees with COVID-19 went from two to 89 in the span of just six days. *See* Sam Kelly, *Sheriff announces 51 new coronavirus cases at Cook County Jail, raising total to 89*, Chi. Sun Times (Mar. 28, 2020), https://chicago.suntimes.com/coronavirus/2020/3/28/21198407/cook-county-jail-coronavirus-covid-19-cases-inmates-89. And, recently, an outbreak at a low-security federal facility in Louisiana led to the death of a 49-year-old prisoner, the admission of a prison guard into the intensive care unit, and positive tests for 30 additional prisoners and staff. *See* Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html. Dozens more are now in quarantine. *See id.*

Washington, D.C.'s detention facilities are by no means immune from the disease.  Giftos Decl. ¶7.  Cases in the Washington, D.C. region have surged in recent days, increasing the risk that the virus will spread through our detention facilities. *See* D.C., Md. & Va.  Infographic, Known cases in the region, Wash. Post, https://www.washingtonpost.com/graphics/local/dc-maryland-virginia-coronavirus-cases/?itid=sf_local (showing that cases in Washington D.C., Maryland, and Virginia have surged from zero cases at the beginning of March to over 4,062 cases by April 1, 2020 and that 82 people in the region have died from the disease) (last visited Apr. 1, 2020). Indeed, as of March 31, 2020, seven residents and one staff personnel at DC jails had tested positive for the virus and an additional 194 were being held in isolation due to potential exposure. *See* Government of District of Columbia, Public Safety Agency COVID-19 Case Data: Department of Corrections (Mar. 30, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data.  This month, a marshal at the D.C. Superior Court tested positive for

the virus. This marshal had access to several cell blocks at the D.C. Jail and was assigned to work in two D.C. busy courtrooms where dozens of defendants, including juveniles, have their arraignments. *See* Jack Moore, *Coronavirus: Maryland announces 1ˢᵗ Covid-19-related death as region sees jump in new cases*, WTOP NEWS (Mar. 18, 2020), https://wtop.com/coronavirus/2020/03/coronavirus-updates-dc-maryland-virginia/. The situation has become so dire that the union representing correction officers at the D.C. Jail unanimously voted "no confidence" in D.C. Jail leadership for their handling of COVID-19. *See* Sophie Kaplan, *Union vote 'no confidence' in D.C. Jail leaders for handling of Covid-19*, WASH. TIMES (Mar. 20, 2020), https://www.washingtontimes.com/news/2020/mar/20/union-votes-no-confidence-dc-jail-leaders-handling/ ("The union representing corrections officers at the D.C. Jail unanimously voted 'no confidence' in the jail's leadership for 'guaranteeing and accelerating the rampant spread of COVID-19' after 50 inmates came in contact with a positive case of the coronavirus.").

The District of Columbia Government recognizes the threat of COVID-19 and Mayor Muriel Bowser has issued increasingly restrictive executive orders. The Mayor based her actions on "the increasing number of confirmed cases of COVID-19 within Washington, DC, and throughout the metropolitan Washington region." *Mayor Bowser Orders Closure of Non-Essential Businesses*, DC.gov (Mar. 24, 2020), https://coronavirus.dc.gov/release/mayor-bowser-orders-closure-non-essential-businesses. She found that extraordinary measures were necessary because: "Medical and public health experts agree that COVID-19 is easily transmitted and it is essential that its spread be slowed to protect the ability of public and private health care providers to handle the expected influx of ill patients and safeguard public health and safety . . . Scientific evidence and public health practices show that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through limiting public activities and

engaging in social distancing. *Id.* Based on these findings, she banned public gatherings and ordered people to remain in their homes.

Indeed, in the COVID-19 Response Emergency Amendment Act of 2020, the D.C. Council authorized the Department of Corrections to provide unlimited additional "good time" to people serving time at the D.C. Jail for misdemeanors, "to effectuate the *immediate release* of persons sentenced for misdemeanors." 67 D.C. Reg. 3106 (March 20, 2020) (emphasis added). If people still in the Jail should be released, it logically follows that similarly situated people at the halfway houses should be released as well.

## III.   The Conditions at Hope Village

Hope Village contracts with both the Federal Bureau of Prisons ("BOP") and the Washington, D.C. Department of Corrections ("DOC"). *See* Department of Corrections: Correction Detention Facility, DC.gov, https://doc.dc.gov/page/correctional-facilities (last visited Mar. 31, 2020). It is contracted to provide housing, educational opportunities, and other programming services to men in BOP custody who are currently serving the tail end of their federal sentences, as well as pre-trial individuals and those sentenced to misdemeanors currently in DOC custody. *Id.*; Ex. 2, Declaration of Thurman Williams ("Ex. 2, Williams Decl.") ¶ 3; Ex. 3, Declaration of Ronald Ian Boatright ("Ex. 3, Boatright Decl.") ¶ 3; Ex. 4, Declaration of Anthony Antonio Pleasant ("Ex. 4, Pleasant Decl.") ¶ 3.  The men confined to Hope Village are in the lowest level of custody status. Until March 20, 2020, when the facility was placed on lockdown, the men who reside at Hope Village were all on work release, meaning they were typically free to leave the facility during the day to attend jobs. Ex. 3, Boatright Decl. ¶ 7.  All those in BOP custody have scheduled release dates within months.  *See, e.g.* Ex. 2, Williams Dec. ¶ 3; Ex. 3, Boatright Decl. ¶ 3; Ex. 4, Pleasant Decl. ¶ 3.

As in other detention facilities, it is obvious that the kinds of social distancing measures that have been a hallmark of the United States' COVID-19 prevention and mitigation efforts are simply not possible at Hope Village. The facility houses approximately 300 individuals in housing blocks of approximately 70 residents, who share small two-bedroom apartments. Ex. 3, Boatright Decl. ¶ 5; Ex. 2, Williams Decl. ¶ 4.; Compl. ¶ 2. Each bedroom houses four prisoners who sleep in bunk beds roughly three feet apart. Ex. 2, Williams Decl. ¶ 5. Each of these apartments has just one bathroom that is shared among all the men assigned to that apartment.  Ex. 1, Giftos Decl. ¶ 25; Ex. 4, Pleasant Decl. ¶ 11.  Despite these close quarters and the fact that prisoners are responsible for cleaning their apartments and common areas, prisoners in Hope Village have limited access to hot water, soap, disinfectants, gloves, and masks to protect themselves and are prohibited from having Lysol and alcohol-based cleaning supplies, including hand sanitizer. Ex. 2, Williams Decl. ¶ 17; Ex. 3, Boatright Decl. ¶ 18.  Prisoners report that the cleaning supplies they have are often watered down. Ex. 3, Boatright Decl. ¶ 18. Hope Village requires that prisoners purchase their own hygiene supplies, but there is no commissary at the facility. Ex. 1, Giftos Decl. ¶ 26. And because the facility went on lockdown on March 20, 2020, which precludes individuals from purchasing products on their own, prisoners are forced to rely on family, if they have family in the area, to drop off such supplies. Ex. 1, Giftos Decl. ¶  27; Ex. 3, Boatright Decl. ¶ 18.

Hope Village's dining facilities preclude the CDC-recommended social distancing, and increase transmission opportunities.  Giftos Decl. ¶ 31. Prisoners at Hope Village eat meals in large groups of approximately 25-30 individuals, with five people surrounding tables approximately five-feet in diameter.  Ex. 1, Giftos Decl. ¶ 31; Ex. 2, Williams Decl. ¶ 13; Ex. 3, Boatright Decl. ¶ 13; Ex. 4, Pleasant Decl. ¶ 15. Silverware is kept in an open communal box, which makes it impossible for prisoners to collect their utensils without touching utensils that other prisoners will

later use.  Ex. 2, Williams Decl. ¶ 14; Ex. 3, Boatright Decl. ¶ 14; Ex. 1, Giftos Decl. ¶ 32. There is no sink in the dining area, so prisoners have no means to wash their hands before they eat or before they touch dining surfaces and eating utensils. Ex. 1, Giftos Decl. ¶¶ 32-33; Ex. 2, Williams Decl. ¶ 11; Ex. 3, Boatright Decl. ¶ 12; Ex. 4, Pleasant Decl. ¶ 14. Instead, prisoners are required to wash their hands in their own apartments and then walk through communal hallways to the dining area, which is located in a separate building, touching surfaces and opening doors that were previously touched by many other prisoners.  Ex. 2, Williams Decl. ¶ 11; Ex. 3, Boatright Decl. ¶ 12; Ex. 1, Giftos Decl. ¶ 33.

Defendants have failed to provide even the most basic medical care during this health emergency. Hope Village has not provided prompt medical attention and testing to those with COVID-19 symptoms, nor does it have any on-site medical staff. Ex. 2, Williams Decl. ¶ 9; Ex. 3, Boatright Decl. ¶ 10; Ex. 1, Giftos Decl. ¶ 37. When Hope Village suspects someone may have contracted COVID-19, the facility places that person in isolation by assigning the person to an apartment without roommates.  Ex. 4, Pleasant Decl. ¶¶ 4-5.  These individuals live alone in an apartment but share hallways with the rest of the men living in the building. Their food trays are brought to them by staff, and they place these trays into shared hallways after eating. Ex. 4, Pleasant Decl. ¶ 5; Ex. 1, Giftos Decl. ¶ 34. These quarantined individuals have at times shared hallways and communal areas and resources, including vending machines, with the rest of the Hope Village population. *Id.*

Crowding and hygiene concerns were amplified on March 20, 2020, when Hope Village issued a shelter-in-place order, requiring all people in custody to stay in the facility at all times. Ex. 2, Williams Decl. ¶ 6; Ex. 3, Boatright Decl. ¶ 18; Ex. 1, Giftos Decl. ¶ 24.  However staff are still permitted to travel in and out of the facility, and Hope Village does not screen staff for

symptoms before permitting reentry. Ex. 1, Giftos Decl. ¶ 23. The facility also continues to accept additional prisoners, increasing the risk that the disease will enter Hope Village and spread to others. Ex. 1, Giftos Decl. ¶ 22; Ex. 2, Williams Decl. ¶ 19.

The conditions at Hope Village make the threat of COVID-19 spread at Hope Village substantial and urgent.  Increasing concerns about Hope Village's response to the COVID-19 outbreak have been raised by journalists, advocacy groups, and public officials. *See, e.g.*, Jenny Gathright, *Men In D.C.'s Federal Halfway House Say They Are Stuck Inside Without Essential Supplies*, WAMU 88.5 American University Radio (Mar. 25, 2020), https://wamu.org/story/20/03/25/men-in-d-c-s-federal-halfway-house-say-they-are-stuck-inside-without-essential-supplies/.  Complaints about conditions at the halfway house have become so widespread in recent days, in fact, that Congresswoman Eleanor Holmes Norton wrote an open letter to the BOP, expressing "urgent concern" about conditions at the facility. These concerns include that the virus may already be spreading within its walls, that men were unable to practice social distancing, and that residents were being deprived of hand-sanitizer and other hygiene products. *See* March 27, 2020 Letter *in* Press Release: Norton Calls on Federal Bureau of Prisons to Ensure Hope Village Halfway House Residents Safe During the Coronavirus, The DC Line (Mar. 27. 2020), https://thedcline.org/2020/03/27/press-release-norton-calls-on-federal-bureau-of-prisons-to-ensure-hope-village-halfway-house-residents-safe-during-the-coronavirus/.  It has become clear that something must be done to reduce the population and implement all medically-necessary precautions at Hope Village, both to protect prisoners and staff, and to protect our wider communities.

## LEGAL STANDARD

A party seeking either a temporary restraining order or a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2009); *Dunlap v. Presidential Advisory Comm'n on Election Integrity,* 319 F. Supp. 3d 70, 81 (D.D.C. 2018) ("An application for a TRO is analyzed using factors applicable to preliminary injunctive relief."), *rev'd on other grounds*, 944 F.3d 945 (D.C. Cir. 2019).  Courts in the District of Columbia may evaluate these four factors on a "sliding scale" framework, meaning that "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *see Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).  Courts "must not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners' [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* (citation omitted).

"When an action pending in a United States court seeks release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief pendente lite, to grant bail or release, pending determination of the merits." *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969).  This is true when a habeas

petitioner "has shown that exceptional circumstances exist which make the grant of bail necessary to effectuate the habeas remedy." *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014).

## ARGUMENT

Prison conditions that expose people to a serious risk of contracting an infectious disease are constitutionally intolerable.  Because there is no vaccine or cure for COVID-19, the only way to protect the Plaintiffs' constitutional rights is to create an environment that allows the men housed at Hope Village to practice those guidelines laid out by the CDC, including proper hygiene and social distancing. Permitting those prisoners who have available home confinement options to leave the facility will not only lower their chances of contracting the illness, but will also ease crowding at the halfway house and reduce the risks to other prisoners, staff, and the larger community.

Immediate injunctive relief is necessary because the danger at issue—exposure to a virus capable of causing prolonged illness and potentially death—is the quintessential irreparable harm. There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce strain on our overwhelmed health systems. And, in light of the global COVID-19 pandemic, the balance of equities weighs heavily in favor of requiring Hope Village to create a safe environment by permitting men with viable options for home confinement to self-isolate.

## IV.   Plaintiffs are Likely to Succeed on the Merits of Establishing a Constitutional Violation and Negligence.

Residents at Hope Village are likely to succeed on the merits against all Defendants. Specifically, Plaintiffs are likely to: (1) establish a violation of their Eighth Amendment rights by the Federal Bureau of Prisons and the D.C. Department of Corrections through conditions of

confinement that expose Plaintiffs to the serious risks associated with COVID-19, and (2) to establish negligence by Hope Village in failing to exercise due care to prevent the spread of COVID-19 under the circumstances.

### A. The Governmental Defendants' Deliberate Indifference to Plaintiffs' Health and Safety Violates Plaintiffs' Eighth Amendment Rights.

To prevail on a claim that conditions of confinement violate the Eighth Amendment, a plaintiff must meet two requirements: (1) the deprivation alleged must objectively be "'sufficiently serious,'" and (2) the "prison official must have a 'sufficiently culpable state of mind,'" such as "deliberate indifference" to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).

Here, the risks posed by COVID-19 are unquestionably "serious," and Defendants are being deliberately indifferent to that risk. Defendants therefore violated Plaintiffs' constitutional rights by confining them to living conditions that enhance exposure to a serious infectious disease with potentially life-threatening consequences. These inhumane conditions warrant a Court order requiring Plaintiffs' immediate release from Hope Village.

### 1. Plaintiffs' conditions of confinement are sufficiently serious as to pose a substantial risk of serious harm by exposing them to an infectious disease.

A substantial risk of serious harm is one that jeopardizes the plaintiffs' health or safety. *See Caldwell v. Dist. of Columbia*, 201 F. Supp. 2d 27, 35 (D.D.C. 2001). The risk of harm to plaintiffs' health or safety need not yet have been realized; the Eighth Amendment also protects against likely future harms. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (stating "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"). Indeed, one such future harm explicitly identified by the Supreme Court was overcrowding in situations where inmates are

14

at risk of exposure to a serious, communicable disease, "even though the possible infection might not affect all of those exposed." 509 U.S. at 33 (citing *Hutto*, 437 U.S. at 682 (1978)).  In such settings, the conditions of confinement are "sure or very likely to cause serious illness and needless suffering the next week or month or year," and thus fall under Eighth Amendment protection. *Id.*

Here, the government is violating the Eighth Amendment by crowding prisoners into Hope Village despite the serious risk posed by COVID-19.  Plaintiffs are confined in conditions where it is impossible to achieve adequate CDC-mandated social distancing, thus dramatically increasing the likelihood they will contract COVID-19 and fall ill.  Meals are provided at packed tables placed close together, where the men are required to sit shoulder-to-shoulder.  Ex. 1, Giftos Decl. ¶ 31; Ex. 2, Williams Decl. ¶ 13; Boatright Decl. ¶ 13; Ex. 4, Pleasant Decl. ¶ 15. Utensils are placed in a communal container, which all prisoners must reach into without provided proper sanitizer or access to soap beforehand.  Ex. 2, Williams Decl. ¶ 14; Ex. 3, Boatright Decl. ¶ 14; Ex. 1, Giftos Decl. ¶ 32. Given the CDC's guidance on social distancing, these conditions of confinement, which are poised to become worse as Defendants continue to accept new residents into Hope Village, clearly place Plaintiffs at substantial risk of serious harm.

Substantial risk of serious harm also stems from Plaintiffs' confinement in unhygienic conditions.  Plaintiffs do not have access to hand sanitizer or disinfectants, as Hope Village prohibits residents from possessing these items due to "safety concerns." Ex. 2, Williams Decl. ¶ 17; Ex. 3, Boatright Decl. ¶ 18; *see also* Ex. 1, Giftos Decl. ¶¶ 27-28;  When prisoners are forced to carry out cleaning duties, they are not given any protective gear, and thus are being exposed to bodily fluids. Ex. 2, Williams Decl. ¶ 15; Ex. 3, Boatright Decl. ¶ 17. The communal dining area is not sanitized between uses. Ex. 2, Williams Decl. ¶ 12; Ex. 4, Pleasant ¶ 17.  Prisoners have communal bathrooms with limited sinks and showers, which are not cleaned with frequency. Ex.

2, Williams Decl. ¶ 5; Ex. 3, Boatright Decl. ¶ 6; Ex. 1, Giftos Decl. ¶¶ 25, 27.  Prisoners have no

access to a water fountain or source of water, other than to use the bathroom sink or purchase

overpriced water from a vending machine, as Defendants refuse to allow water from outside of

Hope Village onto the premises. Ex. 3, Boatright Decl. ¶ 21; Ex. 2, Williams Decl. ¶18. It is

impossible to prevent the spread of COVID-19 under such conditions.  Ex. 1, Giftos Decl. ¶ 40-

41.  Indeed "[c]ongregate settings like Hope Village allow for rapid spread of infectious diseases

that are transmitted person to person." *Id.*  "When people live in close, crowded quarters and must

share dining halls, bathrooms, showers, and other common areas, the opportunities for

transmission are greater." *Id.*  Plaintiffs' current conditions of confinement at the Hope Village

facilities therefore pose substantial risk of serious harm that jeopardizes the Plaintiffs' health or

safety.

> **2.     The governmental defendants continue to show deliberate indifference
> to the substantial risk of harm that COVID-19 poses to Plaintiffs.**

A prison official is "deliberately indifferent" if he or she "'knows of and disregards an

excessive risk to inmate health or safety.'"  *Farmer v. Moritsugu*, 163 F.3d 610, 614 (D.C. Cir.

1998) (quoting *Brennan*, 511 U.S. at 837).  To demonstrate deliberate indifference, "it is enough

that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Brennan*,

511 U.S. at 842; *see also Jones v. Hurwitz*, 324 F. Supp. 3d 97, 100 (D.D.C. 2018). "Whether a

prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence."  *Brennan*,

511 U.S. at 842. Prison officials may be deliberately indifferent to the exposure of inmates to a

serious, communicable disease even if the complaining prisoner shows no serious current

symptoms.  *Helling*, 509 U.S. at 33.

While the obviousness of the risk itself is enough to allow a factfinder to conclude that the BOP and DOC know of the substantial risk of COVID-19, *Farmer*, 511 U.S. at 842, these Defendants were in fact aware of the serious risks that COVID-19 poses to detained populations, including to those held in halfway houses. There has been widespread news coverage regarding the risks and rapid spread of COVID-19 in detention facilities across the country. *See supra* Factual Background.  Indeed, both DOC and BOP have been dealing with the proliferation of COVID-19 in their own facilities, including an outbreak in Louisiana that led to the death of a federal prisoner. *See* Factual Background.  The CDC has released guidance specific to addressing the risks of COVID-19 in jails, and BOP itself provided specific Residential Reentry Centers regarding steps to be taken to modify operations in light of the current pandemic.  *See* Memorandum from Jon Gustin, Administrator, Residential Reentry Management Branch, to All RRC Contract Providers, *Coronavirus (COVID-19) Precautions/Modified Operations for Residential Reentry Centers* (Mar. 24, 2020),

https://www.bop.gov/coronavirus/docs/memo_modified_rrc_operations_20200324.pdf.

Further,  BOP and DOC are clearly aware of the unhygienic and crowded conditions at Hope Village and, as the entities responsible for placing individuals at Hope Village, are aware that new prisoners are continuing to be sent to the facility. Information regarding the inadequate conditions at Hope Village has been widely reported by news outlets. *See, e.g.,* Jenny Gathright, *Men in D.C.'s Federal Halfway House Say They Are Stuck Inside Without Essential Supplies*, WAMU (Mar. 25, 2020), https://wamu.org/story/20/03/25/men-in-d-c-s-federal-halfway-house-say-they-are-stuck-inside-without-essential-supplies/; Justin Moyer and Keith Alexander, *D.C. Council member calls on Federal Bureau of Prisons to address coronavirus concerns at halfway house*, Washington Post (Mar. 26, 2020), https://www.washingtonpost.com/local/dc-council-

17

member-calls-on-federal-bureau-of-prisons-to-address-coronavirus-concerns-at-halfway-house/2020/03/26/d73c0f56-6fa8-11ea-b148-e4ce3fbd85b5_story.html. The District of Columbia Corrections Information Council, a governmental entity charged with oversight activities for the D.C. DOC, also released a report "regarding their preparations and response to the novel coronavirus outbreak." *Re: CIC Visit to Hop Village on Thursday, March 26, 2020*, DC.gov (Mar. 27, 2020), https://cic.dc.gov/node/1469876. According to the CIC report, the CIC's staff had spoken both with Hope Village executives and program staff, as well as the BOP Residential Re-Entry Manager. *Id.* It stated that the DOC had also conducted its own independent investigation into Hope Village. *Id.* Congresswoman Eleanor Holmes Norton also sent a letter to the BOP expressing concern about the conditions at Hope Village. Press Release, Eleanor Holmes Norton, Norton Urges Department of Justice to Apply First Step Act to D.C. Inmates in Federal Bureau of Prisons, as Congress Intended, in Light of Coronavirus (Mar. 22, 2020), https://norton.house.gov/media-center/press-releases/norton-urges-department-of-justice-to-apply-first-step-act-to-dc-inmates. Furthermore, the Washington Lawyers' Committee for Civil Rights and Urban Affairs drafted a letter to the Administrative Director of Hope Village, the Director of the DOC, and the BOP General Counsel raising concern about these same conditions. Ltr. from Lyndsay Niles, Washington Lawyers' Committee for Civil Rights and Urban Affairs, to Joseph Wilmer, Administrative Director, Hope Village (Mar. 25, 2020), https://www.washlaw.org/wp-content/uploads/2020/03/2020.03.25.Letter-to-Hope-Village-regarding-Coronavirus.pdf. However, in the face of the knowledge that conditions at Hope Village are inadequate to protect the prisoners from COVID-19, Hope Village spokesperson Phinis Jones reported to the media outlet WAMU that "[t]he [Federal Bureau of Prisons] has decided that it is not in the best interests of the community or the men for them to leave the facility." Jenny

18

Gathright, *Men in D.C.'s Federal Halfway House Say They Are Stuck Inside Without Essential Supplies*, WAMU (Mar. 25, 2020), https://wamu.org/story/20/03/25/men-in-d-c-s-federal-halfway-house-say-they-are-stuck-inside-without-essential-supplies/. Therefore, it is clear that despite Defendants' awareness of the serious risk that COVID-19 poses to Plaintiffs and their knowledge of the conditions at Hope Village, Defendants failed to address these risks. Indeed, Defendants failed to remedy overpopulation and improve sanitary conditions to the levels necessary to protect inmates health and safety.

The deliberate indifference is especially apparent given that there is little or no penological or public safety interest in keeping the plaintiffs in secure custody. Prior to the lockdown, they were in the lowest possible custody level, left and entered the facility daily, and were no more than months from release. Many have homes waiting for them where they can shelter in place in an environment conducive to their health and to public health. Ex. 3, Boatright Decl. ¶ 3; Ex. 2, Williams Decl. ¶ 3.

There is sufficient evidence that COVID-19 poses a serious risk and that Defendants are aware of the risk both from direct notice and from circumstantial evidence. BOP and DOC's failure to release prisoners from these inhumane conditions of confinement, and unwillingness to ensure that Hope Village takes even the bare minimum action to improve those conditions, shows deliberate indifference to that risk. It is structurally impossible for Hope Village to continue housing all of the current prisoners in a way that adequately protects prisoners from serious harm. Because there is overwhelming evidence that BOP and DOC knew that Hope Village has failed to take the necessary steps to protect Plaintiffs, and refused to release them in spite of their lowest custody status, Plaintiffs will likely prevail on the merits.

**B.      Hope Village has Breached its Duty of Care Owed to the Prisoners, Resulting in Harm.**

Plaintiffs are also likely to establish negligence by Hope Village in Hope Village's failing to exercise due care to prevent the spread of COVID-19 under the circumstances.  Under District of Columbia law, negligence requires the plaintiff to prove: "(1) the defendant owed a duty [of care] to the plaintiff, (2) the defendant breached its duty, (3) and that breach was the proximate cause of (4) damages sustained by the plaintiff."  *Morris v. Corr.  Corp. of Am.*, 75 F. Supp. 3d 457, 459 (D.D.C. 2014) (alteration in original) (quoting *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 283 (D.D.C. 2011)).

Defendants owed Plaintiffs a duty of care as custodians. "One who is required by law to take . . . custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a duty [to take reasonable action to protect them against unreasonable risk of physical harm] to the other." Restatement (Second) of Torts § 314A (1965); *Feirson v. D.C.*, 362 F. Supp. 2d 244, 246 (D.D.C. 2005), *aff'd*, 506 F.3d 1063 (D.C. Cir. 2007) (citing Restatement (Second) of Torts § 314A as good law). Here, as the operators of a halfway house, Hope Village has taken custody of Plaintiffs such as to deprive prisoners of their normal opportunities for protection. Further, Defendants prohibit Plaintiffs from residing elsewhere and refuse to allow Plaintiffs to leave their facility.  Ex. 1, Giftos Decl. ¶ 22; Ex. 3, Boatright Decl. ¶ 7; Ex. 2, Williams Decl. ¶ 6. Hope Village therefore owes a duty of care to Plaintiffs to take reasonable action to protect Plaintiffs against unreasonable risk of physical harm. In this case, that harm is the risk of contracting COVID-19.

Hope Village is breaching this duty by continuously failing to take reasonable actions to stop the spread of COVID-19. A plaintiff can prove breach by showing that a defendant failed to properly maintain facilities or to correct a known dangerous condition. *Morris*, 75 F. Supp. 3d at

459–60; *Hickey v. Wash. Metro. Area Transit Auth.*, 360 F. Supp. 2d 60, 62 (D.D.C. 2004) ("the defendant may be liable if it had actual or constructive notice of a dangerous condition, but failed to correct or remove the danger."). Hope Village has ample notice of the danger and of the steps necessary to prevent the spread of this serious illness. There has been constant news coverage and communications released by the CDC regarding the importance of social distancing and proper sanitary procedures in reducing the spread of COVID-19. *See* Centers for Disease Control and Prevention, *Coronavirus (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/index.html (last visited Apr. 1, 2020). Residential Reentry Centers were also provided with specific guidance by the Bureau of Prisons regarding modified operations, *see* Memorandum from Jon Gustin, Administrator, Residential Reentry Management Branch,  to All RRC Contract Providers, *Coronavirus (COVID-19) Precautions/Modified Operations for Residential Reentry Centers* (Mar. 24, 2020),

https://www.bop.gov/coronavirus/docs/memo_modified_rrc_operations_20200324.pdf, so  that they could implement plans similar to those of the BOP. Hope Village has not done so.

Rather than take reasonable precautions to stop the spread of a potentially life-threatening illness to their residents, Hope Village continues to defy the advice and guidance given by the medical community and the CDC. Plaintiffs are confined in conditions without adequate CDC-mandated social distancing, dramatically increasing the likelihood they will contract COVID-19. Ex. 1, Giftos Decl. ¶ 20. Plaintiffs and declarants describe overcrowded conditions. Ex. 3, Boatright Decl. ¶ 6, 11, 13; Ex. 4, Pleasant Decl. ¶¶ 12, 15-16; Ex. 2, Williams Decl. ¶¶ 5, 13-14; Ex. 1, Giftos Decl. ¶¶ 25, 31. Residents live in small spaces with between four and eight prisoners in each apartment. Ex. 3, Boatright Decl. ¶ 5; Ex. 4, Pleasant Decl. ¶ 11; Ex. 2, Williams Decl. ¶ 4; Ex. 1, Giftos Decl. ¶ 25. They also eat meals in crowded dining halls. Ex. 3, Boatright Decl. ¶¶

13-14; Ex. 4, Pleasant Decl. ¶ 15; Ex. 2, Williams Decl. ¶¶ 13-14; Ex. 1, Giftos Decl. ¶ 31-32. Hope Village has not educated residents on ways to mitigate the risk of contracting COVID-19. Ex. 1, Giftos Decl. ¶ 36; Ex. 3, Boatright Decl. ¶ 15 .  Nor has it implemented screening for staff or residents. Ex. 3, Boatright Decl. ¶ 9; Ex. 2, Williams Decl. ¶ 8; Ex. 1, Giftos Decl. ¶¶ 22-23 Instead, Hope Village prevents residents from accessing proper sanitation products and hand sanitizer. Ex. 3, Boatright Decl. ¶¶ 16,18-19; Ex. 2, Williams Decl. ¶ 17; Ex. 1, Giftos Decl. ¶ 27. By blatantly disregarding the advice and guidance of the medical community, Hope Village is continually breaching the duty of care it owes to Plaintiffs.

Hope Village's breach is also the proximate cause of any damages the Plaintiff will sustain—namely, the contraction of COVID-19. The ease of transmission of COVID-19 is widespread knowledge. *See* Ex. 1, Giftos Decl. ¶ 4; Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Mar. 30, 2020).  It is foreseeable that by confining prisoners in facilities without sufficient room for social distancing, and without access to proper sanitation, that there is a high likelihood of contracting COVID-19. The short and long-term effects of contracting COVID-19 are also highly publicized.

Injunctive relief is the only effective remedy to protect prisoners at Hope Village from the facility's negligent behavior.  "In negligence actions where irreparable injury is threatened, a court may act by injunction to prevent harm before it occurs." *See Women Prisoners of D.C. Dep't of Corr. v. D.C*., 899 F. Supp. 659, 666 (D.D.C. 1995).  Whether injunctive relief is appropriate to protect against a threatened tort depends on a number of factors, including "the relative adequacy to the plaintiff of an injunction and of the other remedies, plaintiff's laches or unclean hands, the

relative hardship likely to result to defendant if an injunction should be granted and to plaintiff if it should be denied, the interests of third persons and of the public and the practicability of framing and enforcing the order of judgment." *Id.* It is clear that the only adequate remedy to protect prisoners at Hope Village from the very real threat of contracting COVID-19 is to require that Hope Village implement medically-necessary precautions and create an environment that permits social distancing. Monetary damages are insufficient and would do nothing to shield individuals at Hope Village from contracting the potentially-deadly virus. The burden on Hope Village if an injunction is granted far less that the hardships that prisoners and staff will face if injunctive relief is denied and COVID-10 spreads within the facility's walls. Further, there is a strong public interest in preventing Hope Village from contributing to the spread of COVID-19 within the facility, as any spread of the disease at Hope Village would undoubtedly spread within the broader community. It is clear that the threatened harm at issue is "sufficient[ly] serious[] and imminen[t] to justify coercive relief." *Id.* Infection With a Lethal Virus That Lacks Any Vaccine or Cure Constitutes Irreparable Harm.

Plaintiffs will suffer irreparable harm absent an injunction. To be irreparable, a harm must be "'certain and great,' 'actual and not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief,'" as well as "'beyond remediation,' meaning: [mere] injuries . . . in terms of money, time, and energy necessarily expended in the absence of a stay are not enough." *Fraternal Order of Police Library of Congress Labor Comm. v. Library of Congress,* 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (citation omitted).

Cases of COVID-19 are increasing exponentially, both regionally and across the United States. Ex. 1, Giftos Decl. ¶¶ 4-7. The rapid spread of COVID-19 through the nation's correctional facilities, and the life-threatening nature of the disease, is by no means theoretical. *See supra*

Factual Background; Ex. 1, Giftos Decl. ¶ 7. As stated, cases in the Washington, D.C. region have surged in recent days, increasing the risk that the virus will spread through our detention facilities. *Id.* Given the deadliness of the disease, the vulnerability of prisoner populations, and the country's overburdened medical system, there is a real possibility that absent immediate relief from the Court, Plaintiffs will be infected with COVID-19, and possibly die or suffer long-term health consequences as a result. Ex. 1, Giftos Decl. ¶¶ 41, 44.

The Constitution does not require that Plaintiffs suffer the grave consequences of COVID-19 infection before they are entitled to injunctive relief. As the Supreme Court has explained, "a prison inmate . . . could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery." *Helling*, 509 U.S. at 33. Irreparable harm is established where, as here, a preliminary injunction is necessary to preserve the health of someone in a detention setting. *See, e.g., Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759-60 (5th Cir. 2018) (finding a substantial threat of irreparable injury where prison officials failed to provide prisoner with precribed diabetic diet, thus exposing him to serious health risks). In fact, even the failure to *test* for a disease has been sufficient to support a finding of irreparable harm. *See Boone v. Brown*, No. Civ. 05-0750(AET), 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa. Dep't of Corr.*, No. 90-7497, 1992 WL 277511, at *5, *7-8 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for tuberculosis); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (correctional officers have an affirmative obligation to protect prisoners from infectious disease).

In addition, plaintiffs have shown irreparable harm because, as demonstrated above, they face a violation of their constitutional rights. *See Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312

(D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

## V.   There is a Strong Public Interest in Minimizing the Spread of COVID-19 through Social Distancing and Hygiene Practices that are Impossible at Hope Village

There is strong public interest in minimizing the spread of COVID-19.  Indeed the District of Columbia has issued a series of orders and declaration in recent days, including a stay-at-home order that prohibits people from leaving their residences except in very narrow circumstances. These orders and declarations have made clear that the District of Columbia shares this interest and that it is willing to minimize the spread of COVID-19 through radical social distancing measures.  Ex. 1, Giftos Decl. ¶ 6. First, the disease is highly contagious and has no vaccine or cure, meaning that each new infection would almost certainly result in still more individuals becoming infected.  *See supra* Factual Background; Ex. 1, Giftos Decl. ¶ 8. Healthcare professionals have agreed (nearly unanimously) that the most critical actions that can be taken are preventive measures such as self-isolating, maintaining a distance of six feet from other persons, and frequent disinfection. *See supra* Factual Background; Ex. 1, Giftos Decl. ¶ 8. These measures are simply not possible in the conditions at Hope Village, as detailed above. Ex. 1, Giftos Decl. ¶ 43.  Even with an improvement in hygiene and sanitation to address the spread of COVID-19 in Hope Village, reducing the population at the facility is a necessary mitigation strategy. *Id.* ¶ 41-44. And because staff at Hope Village are permitted to travel freely in and out of the facility, a contagion within Hope Village will almost certainly spread, via staff, to the surrounding communities.  *Id.* ¶ 23.

Second, there is a strong public interest in minimizing the spread of COVID-19 to help address the overwhelmed state of the U.S. medical system.  This Court has recognized that "the

burden on our health care system, and the concomitant burden on our national economy, of treating those suffering from … disease, is of enormous significance." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 991 (D.D.C. 2006); *id.* at 990 (court considering the public interest in denying Defendants' motion for stay of judgment finding Defendants liable under RICO).  These are precisely the issues in the present case.  Indeed, the governors of Virginia and Maryland have warned that regional hospitals could soon be overwhelmed with cases and that both states lack enough ventilators and other equipment to meet the expected surge. *See* Antonio Olivo, Ovetta Wiggins, & Fenit Nirappil, *Virginia, Maryland governors warn that hospitals soon may be overwhelmed by surge in coronavirus cases*, WASH. POST (Mar. 27, 2020), https://www.washingtonpost.com/local/washington-area-hospitals-prepare-for-surge-of-coronavirus-patients-with-limited-supplies/2020/03/27/7c6c0304-7031-11ea-b148-e4ce3fbd85b5_story.html.  Failure to prevent the spread of the disease in a single correctional facility may contribute greatly to that outcome. *See* Chuk Goudie et. al.*, Illinois prisoners sick with COVID-19 "overwhelm" Joliet hospital*, ABC CHIC. (Mar. 30, 2020), https://abc7chicago.com/coronavirus-illinois-chiciago-cases/6064085/ (reporting that infected inmates from the Stateville Correctional Center have "overwhelmed" the Saint Joseph Medical Center in Joliet, Illinois).  It is accordingly strongly in the public interest to prevent or minimize the spread of the virus at Hope Village and help allow the medical system time to treat current patients and expand its capacity.

## VI.     The Balance of Equities Favors an Improvement in Conditions in Hope Village, Including Depopulation.

The balance of equities weighs heavily in favor of requiring Hope Village to reduce its prisoner population and to take other measures to protect the health of its inmates against the COVID-19 threat. When deciding whether to grant injunctive relief, "courts must balance the

competing claims of injury and consider the effect on each part of the granting or withholding of the requested relief." *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018) (citation omitted). Here, the interest in protecting individuals from serious physical harm outweighs monetary costs to government entities. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004). Plaintiffs' interests in preventing or minimizing the odds of exposure to a deadly virus is essentially an interest in survival and the preservation of their lives. As stated, many of the men held at Hope Village have essentially completed their federal sentences and have been cleared for imminent release. *See supra* Factual Background. Some are set to be released to home confinement in a matter of weeks. *See* Ex. 4, Pleasant Decl. ¶ 3. Continuing to expose these men to conditions where they are likely to be infected, only to release them soon afterward, is not equitable—and is actually likely to contribute to the spread of the disease.

Defendants' countervailing interest in continuing to hold men in these conditions is weak at best. In sharp contrast to Plaintiffs' hardships, Defendants will merely be required to release to home confinement those individuals who have already been found by BOP to be eligible for imminent release, and to provide reasonable and basic sanitation in light of the spread of COVID-19 to the remaining prisoners. Further, prior to the present lockdown, prisoners at Hope Village were permitted to travel freely to work each day, demonstrating that the BOP and DOC cannot possibly believe these individuals constitute a continued threat to the public at large.

Indeed, courts across the country have balanced these competing interests and determined that the most equitable solution to addressing the spread of COVID-19 in correctional facilities, and to protect prisoners and staff alike is, to order release on an emergency basis. This is true even in places where the disease has not yet spread, and for people who would not otherwise be permitted to reside in low-security facilities from which they may (under normal circumstances)

come and go daily. *See, e.g., United States v. Fellela*, No. 3:19-cr-79 (JAM), 2020 U.S. Dist.

LEXIS 49198 (D. Conn. Mar. 20, 2020) (ordering the release of a diabetic criminal defendant who

was awaiting sentencing on federal charges, even though there had been no COVID-19 cases in

the facility and the court credited the government's representations about the precautions taken to

prevent the spread of coronavirus); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL

1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (reconsidering bail determination and releasing pretrial

detainee; "[a]lthough there is not yet a known outbreak among the jail and prison populations,

inmates may be at heightened risk of developing COVID-19 should an outbreak develop.");

Motion and Order Granting Emergency Mot. for Immediate Transfer to Home Confinement,

*United States v. Bell et al.*, No. 1:16-cr-00485-JKB (D. Md. Mar. 19, 2020), Dkt. Nos. 1726-27

(ordering that a woman held in a halfway house in Maryland be released to home confinement to

serve the four-month remainder of her sentence outside the facility); Consent Order, *In re Request*

*to Commute or Suspend County Jail Sentence*,  Case No. 084230 (N.J.S.C. Mar. 22, 2020) (New

Jersey Chief Justice ordering release of inmates serving a county jail sentence as a condition of

probation or as a result of a municipal court conviction); Letter from Mike McGrath, Chief Justice,

Supreme Court of Montana, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020),

https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-

19%20032020.pdf?ver=2020-03-20-115517-333 (letter from the Chief Justice of the Supreme

Court of Montana asking judges to "review [their] jail rosters and release, without bond, as many

prisoners as you are able, especially those being held for non-violent offenses" because "[d]ue to

the confines of [jail] facilities, it will be virtually impossible to contain the spread of the virus");

Temporary Restraining Order and Order to Show Cause at 10, *Castillo v. Barr*, No. 20-cv-605

(TJH) (C.D. Cal. Mar. 27, 2020), Dkt. No. 32 (ordering that petitioners be released from

immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high").

## CLASS ALLEGATIONS

The early stage of this litigation should not deter the Court from provisionally certifying the Plaintiff class, subject to later consideration or amendment, for the purpose of this temporary restraining order or preliminary injunction, because the propriety of class treatment here is apparent. Courts in this district have done so many times. *See, e.g.*, *Kirwa v. U.S Dep't of Defense*, 285 F. Supp. 3d 21, 44 (D.D.C. 2017) (granting provisional class certification in context of granting preliminary injunction); *R.IL-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015) (same); *Chang v. United States*, 217 F.R.D. 262, 274 (D.D.C. 2003) (granting provisional class certification before defendants had filed their opposition to certification); *Bame v. Dillard*, No. 05-cv-1833, 2008 WL 2168393 at *9 (D.D.C. May 22, 2008) (provisionally certifying class "without prejudice to Defendant's renewed objections after the close of discovery"); *Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 178 (granting provisional class certification and noting that Rule 23(c)(1) "provid[es] that class certification may be granted provisionally and subsequently altered or amended").

## CONCLUSION

The country faces an unprecedented public health and humanitarian crisis. This virus presents risks to all of us, and has forced us to come together as a country to do what is right for our communities. We must allow and encourage everyone in our society to engage in practices that curb the spread of this disease—social distancing and vigorous hygiene. This not only protects the most vulnerable among us, but hopefully gives our overburdened healthcare system the chance to treat those most gravely affected by COVID-19. The only equitable and constitutional solution

is to order the immediate release of men at Hope Village to home confinement so they can protect themselves to the greatest extent possible. We plead with this Court to join the growing voices of courts who have decided to act in an effort to flatten the curve. Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.


Dated: April 2, 2020

Respectfully submitted,

   /s/ Kevin Metz
Kevin Metz (D.C. Bar # 494087)
Drew Wisniewski (D.C. Bar # 1016351) (pro hac vice pending)
Clayton LaForge (D.C. Bar # 1033938)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC  20004
Tel:  (202) 637-2200
kevin.metz@lw.com
clayton.laforge@lw.com

Jonathan Smith (D.C. Bar # 396578)
Emily Gunston (D.C. Bar # 1032056) (pro hac vice pending)
Lyndsay A. Niles (D.C. Bar # 1003427) (pro hac vice pending)
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS**
11 Dupont Circle, NW, Suite 400
Washington, DC 20036
jonathan_smith@washlaw.org

Scott Michelman (D.C. Bar # 1006945)
Arthur B. Spitzer (D.C. Bar # 235960)
Michael Perloff (D.C. Bar # 1601047)
**ACLU FOUNDATION OF THE DISTRICT OF COLUMBIA**
915 Fifteenth Street NW, Second Floor
Washington, DC 20005
Tele: (202) 457-0800
artspitzer@gmail.com

smichelman@acludc.org
mperloff@acludc.org

*Attorneys for Plaintiffs*