UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THURMAN WILLIAMS, *et al.*,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>FEDERAL BUREAU OF PRISONS, *et al.*,<br><br>     *Defendants*. | Civil Action No. 20-0890 (RC) |

**MEMORANDUM OF POINTS AND AUTHORITIES BY THE
BUREAU OF PRISONS AND ITS DIRECTOR IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

TIMOTHY J. SHEA
*United States Attorney*

DANIEL F. VAN HORN
*Chief, Civil Division*

JOHNNY H. WALKER
*Assistant United States Attorney*

United States Attorney's Office
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
johnny.walker@usdoj.gov

*Counsel for Defendants
the Federal Bureau of Prisons and
the Director of the Federal Bureau of Prisons*

April 6, 2020

# CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    Residential Reentry Centers...................................................................2

    B.    Hope Village ........................................................................................3

    C.    COVID-19 and the Bureau's Response ................................................4

    D.    Plaintiffs and Their Allegations ..........................................................11

STANDARD.........................................................................................................................12

ARGUMENT........................................................................................................................14

I.    Plaintiffs are unlikely to succeed on the merits ...............................................14

    A.    The BOP has not shown deliberate indifference but has taken appropriate measures to protect the health of Hope Village residents and the public ..............14

    B.    Releasing residents from Hope Village would not redress the alleged injuries; instead, it would likely result in injury to some residents.....................................19

    C.    The BOP lacks authority to unilaterally truncate judicially imposed sentences, which can only be modified by the sentencing court ..........................20

II.    Plaintiffs have not established imminent irreparable harm................................22

III.    Public health and safety would not be served by granting the requested preliminary relief ...............................................................................................24

IV.    Plaintiffs have not provided a sufficient basis for preliminary class certification, and class-wide relief would likely harm many Hope Village residents............................25

CONCLUSION.....................................................................................................................27

## INTRODUCTION

Plaintiffs Thurman Williams and Ronald Boatright are two federal prisoners currently housed at Hope Village, a residential reentry center that contracts with the Federal Bureau of Prisons to house inmates transitioning from incarceration to life in the community. Arguing that the current sleeping arrangements and dining schedule at Hope Village do not allow them to practice the social distancing recommended by the Centers for Disease Control and Prevention to suppress the spread of the novel coronavirus, Messrs. Williams and Boatright seek an emergency injunction requiring the Bureau to immediately release and remove from the facility a substantial (but unspecified) percentage of Hope Village's residents. Plaintiffs also seek an order to correct alleged deficiencies in the center's cleaning and hygiene practices. Alternatively, they would like their own release.

The requested injunction should be denied because these claims are unlikely to succeed. First, Plaintiffs cannot possibly show that the Bureau has been deliberately indifferent with respect to the coronavirus pandemic. It has taken significant steps to move suitable residents to home confinement and to ensure the health, safety, and wellbeing of its inmate population, including those living at Hope Village. Indeed, just recently, the center was inspected by the Corrections Information Council, an independent monitoring body, which found no safety or sanitary issues. And the facility has not had any staff member or inmate contract the coronavirus. The three inmates who have shown symptoms consistent with the virus were promptly isolated and ultimately tested negative. In addition, Plaintiffs have not shown that their own release from Hope Village into the community (where the virus is spreading rapidly) would better protect them from contracting the virus. And the Bureau lacks the authority to effectuate the primary relief that Plaintiffs seek against the Bureau: the massive and immediate removal of other inmates from the facility where they live.

Moreover, given the precautions taken by the Bureau and the lack of any confirmed cases (and the fact that Plaintiffs have not articulated any heightened risk factors that would make them particularly susceptible to the coronavirus), Plaintiffs cannot demonstrate a likelihood of irreparable injury on their part. On the other hand, the relief that they seek may very well cause harm to the many inmates that they seek to suddenly remove from the center. If such relief were to be granted, many inmates may well find themselves homeless without access to food, shelter, or medical care in the midst of the pandemic's spread through the District of Columbia. Not only would that be detrimental to those inmates, it would undermine public health efforts and facilitate the spread of the virus throughout society.

Along those same lines, because they have failed to account for the interest of those who would suffer from their requested relief, Plaintiffs are not adequate representatives of the class they seek to provisionally certify.

## BACKGROUND

A.    *Residential Reentry Centers*

The Federal Bureau of Prisons ("the Bureau"), "to the extent practicable, ensure[s] that a person serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. § 3624(c). To that end, the Bureau utilizes privately contracted residential reentry centers (sometimes called halfway houses) to provide a safe, structured, and supervised environment—along with assistive programs and services—to inmates who are nearing release. Gustin Decl. ¶ 6. Residential reentry centers help inmates rebuild ties to the community and facilitate supervision of ex-offenders' activities as they readjust to life outside of custody. *Id.* The Bureau also reserves capacity at

2

residential reentry centers for use by federal courts as an intermediate sanction during supervision or probation. *Id.*

The Bureau contracts with private third parties to staff and manage residential reentry centers. Gustin Decl. ¶ 7. These contractors are solely responsible for ensuring the safe and orderly operation of the centers on a day-to-day basis, pursuant to standards set forth in their contracts with the Bureau. *Id.* The Bureau has Residential Reentry Management field offices located throughout the United States that monitor these residential reentry centers to ensure that they are in compliance with their contractual obligations and guidance provided by the Bureau. *Id.*

B.    *Hope Village*

Hope Village is a residential reentry center located in Southeast Washington, D.C. Gustin Decl. ¶ 12. It has a contract with the Bureau that is currently set to expire on April 30, 2020; however, in light of the pandemic, the Bureau anticipates that it will seek to extend that contract in order to ensure the safety and stability of the residents at Hope Village. *Id.* Hope Village houses a maximum of 250 male federal inmates. *Id.* Currently, there are 192 federal inmates living at Hope Village, with 8 of those cases being individuals placed at the center as a sanction. *Id.* Another 36 federal inmates are on home confinement and report to Hope Village for supervision and services. *Id.*

Pursuant to the contract with Hope Village, the Bureau conducts an announced full monitoring of Hope Village annually with unannounced interim monitoring conducted quarterly. Gustin Decl. ¶ 32. Full monitoring includes monitoring the following areas: programming to assist the offenders in their reentry into the community, food services, medical services, staff integrity, discipline, life safety/sanitation, offender accountability, and communication between the contractor and the community corrections staff. *Id.* The last full monitoring occurred from

September 17 through 19, 2019. *Id.* The Bureau identified no deficiencies during this monitoring. *Id.* An interim monitoring by the BOP and the D.C. Corrections Information Council ("CIC")[1] occurred from February 4 through 5, 2020. *Id.* ¶ 33.

      C.     *COVID-19 and the Bureau's Response*

      The world is facing a menacing global threat. In December 2019, reports of a respiratory disease caused by a novel coronavirus began to emerge out of Wuhan, Hubei Province, China. The rapid spread of the virus, named "severe acute respiratory syndrome coronavirus 2" ("SARS-CoV-2"), and the disease it causes, called "coronavirus disease 2019" ("COVID-19"), pose a public-health risk unparalleled in modern times. Although the complete clinical picture is not fully understood, the virus is transmitted easily and quickly, and can have a high mortality rate for some of the most vulnerable members of society; there is currently no proven vaccine or therapeutic treatment. Worldwide, the numbers of infections and fatalities are climbing at an alarming rate, and threaten to overwhelm available medical resources in many locations. On March 11, 2020, the World Health Organization classified the outbreak as a pandemic. In the United States, the outbreak is affecting all 50 states and the District of Columbia, with over 239,000 confirmed cases—more than any other nation—and over 5,400 deaths as of April 3, 2020.[2]

      On January 31, 2020, Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the United States to aid the nation's healthcare community in

---

[1] The CIC is an independent monitoring body mandated by Congress and the D.C. Council to inspect, monitor, and report on conditions of confinement at facilities where D.C. residents are incarcerated. *See* https://cic.dc.gov/page/about-cic.

[2] See https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last visited Apr. 3, 2020).

responding to COVID-19.[3] The President declared a national emergency effective March 1, 2020, *see* 85 Fed. Reg. 15,337 (Mar. 18, 2020), and every U.S. state and territory and the District of Columbia has declared an emergency as well.

The District of Columbia announced its first confirmed case of COVID-19 on March 7, 2020. Giftos Decl. ¶ 6. As of April 3, 2020, the District has experienced 902 confirmed cases of COVID-19 and has reported 21 deaths related to the disease.[4] The mayor of the District of Columbia, Muriel Bowser, declared a state of emergency and a public health emergency on March 11, 2020. *See* Mayor's Orders 2020-045 & 2020-046 (Mar. 11, 2020).[5] On March 30, Mayor Bowser issued a stay-at-home order, requiring "all individuals anywhere in Washington, DC, to stay in their residences except to perform" certain specifically exempted activities. *See* Mayor's Order 2020-054 (Mar. 30, 2020).[6]

Although much about the virus remains unknown, the Centers for Disease Control and Prevention ("CDC") advises that the virus is believed to spread from person to person in close contact through respiratory droplets produced when an infected person coughs, sneezes, or talks.[7] Some studies suggest that the virus may be spread even by persons who are not showing symptoms. *Id.* The CDC therefore recommends that "[m]aintaining good social distance (about 6 feet) is very important in preventing the spread of COVID-19." *Id.* The CDC has also noted that "[i]t may be

---

[3] See https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited Apr. 3, 2020).

[4] See https://coronavirus.dc.gov/release/coronavirusdata-april-3-2020 (last visited Apr. 4, 2020).

[5] See https://coronavirus.dc.gov/release/mayor-bowser-declares-public-health-emergency (last visited Apr. 4, 2020).

[6] See https://coronavirus.dc.gov/release/mayor-bowser-issues-stay-home-order (last visited Apr. 4, 2020). (last visited Apr. 4, 2020).

[7] See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 4, 2020).

possible" that a person can get COVID-19 by touching a surface that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. *Id.* The CDC states, however, that this is not thought to be "the main way that the virus spreads." *Id.* The CDC recommends that people frequently wash their hands with soap and water or an alcohol-based hand rub. *Id.* It also recommends cleaning frequently touched surfaces. *Id.*

The necessary response from all levels and institutions of government is urgent and massive. The federal government has implemented sweeping international travel restrictions and closed our land borders to nonessential travel, and public health officials are focused on slowing the spread and mitigating the impact of this disease across the United States. *See, e.g.*, 85 Fed. Reg. 16,548 (Mar. 24, 2020) (travel restrictions with respect to Canada); 85 Fed. Reg. 16,547 (Mar. 24, 2020) (travel restrictions with respect to Mexico); 85 Fed. Reg. 15,045 (Mar. 16 2020) (Presidential Proclamation suspending entry of certain foreign nationals who have recently visited the Schengen Zone); Executive Order 13,909, 85 Fed. Reg. 16,227 (Mar. 23, 2020) (delegation of certain Defense Production Act authorities); *see also* White House Coronavirus Guidelines for America, available at https://www.whitehouse.gov/briefings-statements/coronavirus-guidelines-america/. The CDC is employing its expertise to provide public-health guidance applicable to a wide range of institutions,[8] and the Government is committed to working closely with state, local, tribal, territorial and other partners to respond to this dire threat.

The Bureau, for its part, has been assessing on an ongoing, emergent basis how best to ensure the safety and health of its staff and inmates from COVID-19 while carrying out is mission critical functions. Gustin Decl. ¶ 35. The Bureau convened a task force as early as January 2020

---

[8] See https://www.cdc.gov/coronavirus/2019-ncov/communication/guidance-list.html (last visited Apr. 2, 2020)

to begin strategic planning for the spread of the virus and to build on the agency's existing contingency plans for epidemics. On March 13, 2020, the Bureau instituted significant measures to prevent the spread of COVID-19 in its facilities, including temporary restrictions on visitation, restricting inmate movement to only required and mission-essential transfers, increased health screening of staff and inmates, and increased sanitary measures. It has also instituted a mandatory 14-day quarantine for all new inmates entering the Bureau from outside a Bureau facility.[9] Effective April 1, 2020, the Director of the Federal Bureau of Prisons ordered every inmate at every institution to be secured in their quarters for fourteen days to decrease the spread of the disease.[10]

At the Attorney General's direction, the Bureau has also significantly increased the number of inmates on home confinement by over 40% and continues to screen all inmates to determine whether they are appropriate for home confinement.[11] By memorandum dated March 26, 2020, the Attorney General directed the Bureau to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." The Attorney General directed the Bureau to consider the totality of the circumstances of each inmate, the statutory requirements for home confinement, and a series of factors including the age and vulnerability of the inmate, the security level of the facility holding the inmate, the inmate's conduct while incarcerated, the inmate's score under the Prisoner

---

[9] https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited Apr. 4, 2020).

[10] See https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 4, 2020).

[11] See https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 5, 2020).

Assessment Tool Targeting Estimated Risk and Needs, whether the inmate has a demonstrated and verifiable reentry plan that will prevent recidivism and ensure public safety (including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at their current facility), and the inmate's crime of conviction.[12]

Generally, the Bureau may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months. 18 U.S.C. § 3624(c)(2). Under the CARES Act, signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." Pub. L. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General made that finding and authorized the Director of the Bureau to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elton, and other similarly situated Bureau facilities where COVID-19 is materially affecting operations. Gustin Decl. ¶ 26.

Pursuant to the Attorney's General's direction, the Bureau will continue to monitor the situation at Hope Village (as at all of its facilities) and will take swift action to exercise its expanded home confinement authority for any inmate who is found to be at risk for COVID-19 and suitable for home confinement. Gustin Decl. ¶ 27. There are, however, a number of reasons that an inmate otherwise statutorily eligible for home confinement may not have an approved release plan allowing them to be placed in home confinement. They may not have a home

---

[12] See https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf (last visited Apr. 5, 2020).

telephone, the residence may not be approved as suitable by Hope Village or U.S. Probation staff, the individual may be homeless, or the individual may have recent discipline for conduct (such as use of drugs or alcohol or fighting) prohibiting placement in home confinement. *Id.* ¶ 29; *see also* Bureau Program Statement No. 7320.01, *Home Confinement* ¶ 8.b. (Aug. 1, 2016).[13] The requirement of a home telephone is particularly needed so that Hope Village staff can verify the inmate's presence in the home by speaking to him on the telephone. Gustin Decl. ¶ 30. Hope Village staff also conduct a visit[14] to the proposed release residence to ensure that the house is otherwise suitable (i.e., no firearms, alcohol, appropriate space for the individual, approved to reside at the location, etc.). *Id.* Once Hope Village staff approve a release plan, they submit it to the Residential Reentry Management Branch at the Bureau for final review and approval. *Id.* The Bureau reviews submissions for home confinement submitted by Hope Village on a bi-weekly basis. *Id.* ¶ 31. It also reviews case notes and program plans during regular monitoring activity. *Id.* If an inmate meets the criteria for home confinement, he will be placed on home confinement. *Id.*

In addition to expanding and prioritizing the placement of eligible inmates on approved home confinement, the Bureau is also taking measures to ensure that staff and inmates housed at residential reentry centers are not at risk for contracting COVID-19. The Bureau has provided guidance to all residential reentry center contractors, including Hope Village, regarding COVID-19 precautions and modified operations. Gustin Decl. ¶ 36. This guidance includes memoranda dated March 13, 2020, and March 24, 2020, from the Administrator of the Residential Reentry Management Branch. *Id.*; Ex. 1, Gustin Memo. (Mar. 13, 2020); Ex. 2, Gustin Memo. (Mar. 24,

---

[13] See https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf (last visited Apr. 5, 2020).

[14] In order to limit in-person contact, the Bureau is allowing these site visits to be conducted remotely by Skype and for interviews with host families to be conducted by telephone. *See* Ex. 3, CIC Rep. at 5.

2020). As detailed in these memoranda, among many other things, the Bureau has restricted visitation, instructed that facilities should implement regular daily temperature testing and screening for COVID-19 symptoms for all residents and staff and the immediate isolation of any resident of staff exhibiting symptoms, and has suspended the need for inmates to make subsistence payments. Exs., 1, 2. The Bureau has also provided its residential reentry centers with copies of the CDC guidance for correctional facilities, a form for use in screening visitors for COVID-19, and other materials produced by the Bureau on fighting the spread of the virus. Gustin Decl. ¶ 36. The Bureau's guidance also includes an attachment to its contract with Hope Village regarding continuing contract performance during a pandemic influenza or other national emergency. *See* Ex. 4.  This attachment requires, among other things, that Hope Village encourage its staff to follow preventative measures as advised by public health services.. *Id.*

Further, the Bureau is aware that the CIC conducted an announced visit of Hope Village on March 25, 2020, in response to complaints about the center's efforts to prevent the spread of COVID-19. Gustin Decl. ¶ 34. That report concluded, among other things, that Hope Village is (1) attempting to achieve social distancing by opening up a second dining area in a vacant apartment, (2) had an adequate supply of hygiene and cleaning products for staff and residents, (3) was cleaning high-traffic areas including light switches and door handles more frequently, (4) screening all incoming inmates (including temperature and symptom checks), and (5) are operating smaller group sessions so that residents can sit several chairs apart. *See* Ex. 3, CIC Rep. at 3–6. The Bureau credits the CIC report and has no reason to doubt the accuracy of its conclusions. Gustin Decl. ¶ 34. The Bureau has not conducted an independent visit to the facility to investigate the complaints because visits are generally disruptive to the program, as visitors must be screened and escorted within the facility. *Id.* Moreover, a duplicative in-person visit would be contrary to

CDC guidelines advising limiting visits to group facilities and would increase the risk of introducing COVID-19 to the facility. *Id.*

As of the time of this filing, there is no indication that any Hope Village staff or resident has or has had COVID-19. Gustin Decl. ¶ 37. To date, three residents at Hope Village have shown symptoms that are consistent with COVID-19. *Id.* Each of those residents were isolated and tested for the virus. *Id.* All three of those tests came back negative. *Id.*

D.     *Plaintiffs and Their Allegations*

Plaintiffs are two residents serving federal sentences at Hope Village. Plaintiff Thurman Williams is 49 years old. Williams Decl. ¶ 1. He was convicted of attempted distribution of cocaine and voluntary manslaughter while armed in the D.C. Superior Court and of assault with a dangerous weapon on a correctional officer in the United States District Court for the Eastern District of Virginia. Gustin Dec. ¶ 38. He was sentenced to 45-month and life terms of imprisonment by the D.C. Superior Court and to a 100-month term of imprisonment by the Eastern District of Virginia. *Id.* He is scheduled for release on December 17, 2020, and is not currently eligible for home confinement because he has not provided a release plan. *Id.*; *see also* Williams Decl. ¶ 3.

Plaintiff Ronald Boatright is 36 years old. Boatright Decl. ¶ 1. He was convicted of a supervised-release violation and of conspiracy to distribute a controlled substance by the United States District Court for the Middle District of Pennsylvania and sentenced to 128 months in prison. Gustin Decl. ¶ 39. His projected release date is September 13, 2020. *Id.*

Anthony Pleasant, who submitted a declaration on behalf of Plaintiffs, is 33 years old. Pleasant Decl. ¶ 1. The Superior Court of the District of Columbia revoked his supervision, finding that he had violated the terms of his supervised release for his previous conviction for armed

11

robbery and second degree murder while armed. Gustin Decl. ¶ 40. He is serving a ten-month sentence and is projected for release on April 14, 2020. *Id.*

Plaintiffs allege that conditions at Hope Village are not in line with CDC guidance for preventing the spread of COVID-19. Specifically, Plaintiffs allege that residents at Hope Village must sleep in close quarters with roommates, eat together, and share bathrooms, Compl. ¶ 6; must clean their own residences, *id.* ¶ 7; are no longer permitted to come and go from the center, *id.* ¶ 8; and do not have an on-site medical team to quickly test those with COVID-19 symptoms, *id.* ¶ 10. They seek an immediate temporary restraining order requiring the Bureau to release enough inmates from their sentences so that "the remaining people can be housed safely and in compliance with CDC guidance at Hope Village," clean the residents' rooms daily (rather than require the residents to do it themselves), reduce the number of residents sharing bedrooms, reduce the number of residents sharing bathrooms, provide residents with cleaning products, ensure that those handling food have been tested for COVID-19,[15] stop admitting new residents to Hope Village, provide an on-site medical team,[16] screen everyone entering Hope Village for COVID-19 symptoms, screen residents who complain of COVID-19 symptoms and implement isolations, and post signage to alert residents to the symptoms of COVID-19. ECF No. 11-2.

## STANDARD

Plaintiffs seek a temporary restraining order. "The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C.

---

[15] According to the CDC, "there is no evidence to support transmission of COVID-19 associated with food." *See* https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited Apr. 6, 2020).

[16] Given the present need for medical professionals to address the rising number of cases of COVID-19 in the District of Columbia, the Bureau submits that it would not be the best allocation of resources to have a medical team present on site at a facility with no sick patients.

2013) (citation omitted). Interim injunctive relief is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A party moving for a temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) ("A party seeking a preliminary injunction must make a 'clear showing that [the] four factors, taken together, warrant relief.'" (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).[17]

Moreover, a plaintiff seeking a mandatory injunction faces a greater hurdle than one seeking a prohibitive injunction. *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). "The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quotation omitted). Therefore, when, as here, the movant seeks mandatory injunctive relief—*i.e.*, an order that "would alter, rather than preserve, the status quo"—an even higher standard applies, and "the moving party

---

[17] "[T]he D.C. Circuit has recently suggested that the sliding scale approach may no longer be applicable after the Supreme Court's decision in *Winter*, and that a more stringent test applies instead." *See Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 38 (D.D.C. 2014) (citing *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (likelihood of success on the merits and irreparable harm may be "independent, free-standing requirement[s] for a preliminary injunction" (citation omitted))); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh & Henderson, JJ., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things.").

must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)), *aff'd*, 159 F.3d 636 (D.C. Cir 1998). "A district court should not issue a mandatory preliminary injunction unless the facts and the law clearly favor the moving party." *Nat'l Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted).

## ARGUMENT

### I.     Plaintiffs are unlikely to succeed on the merits.

   A.     *The BOP has not shown deliberate indifference but has taken appropriate measures to protect the health of Hope Village residents and the public.*

Plaintiffs allege that the conditions of their confinement at Hope Village constitute a violation of the Eighth Amendment. *See* Compl. at 20 (Claim 1). The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "A prison official violates the Eighth Amendment only when two requirements are met." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious'. . . ." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A deprivation is sufficiently serious if "a prison official's act or omission" causing such a deprivation "result[s] in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, "a prison official must have a 'sufficiently culpable state of mind.'" *Id.* (quoting *Wilson*, 501 U.S. at 297). "[T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302–03).

Plaintiffs have not shown that they can meet either of these requirements. First, they have not suffered a "sufficiently serious" deprivation. *See Wilson*, 501 U.S. at 297. To be sure, the

spread of COVID-19 in the District of Columbia puts everyone at some degree of risk of getting sick, but the Bureau has taken appropriate steps to mitigate those risks throughout its inmate population,[18] including with respect to the residents at Hope Village. It has provided Hope Villages with copies of guidance from the CDC, restricted visitation, instructed facilities to implement regular daily temperature testing and screening for COVID-19 symptoms for all residents and staff, directed facilities to immediately isolate any resident of staff exhibiting symptoms, and has suspended the need for inmates to make subsistence payments. Exs., 1, 2; Gustin Decl. ¶ 36.

Further, the CIC report of its visit on March 26, 2020, concluded that Hope Village is taking steps to achieve social distancing where feasible, had an adequate supply of hygiene and cleaning products for use staff and residents, was cleaning high-traffic areas including light switches and door handles more frequently, screening all incoming inmates (including temperature and symptom checks), and operating smaller group sessions so that residents can sit several chairs apart. See Ex. 3, CIC Rep. at 3–6.

In addition, the Bureau is also exercising its expanded home confinement authority to place as many inmates as qualify on home confinement. Qualifying for home confinement is, however, a two way street. An inmate must demonstrate the Hope Villages and Bureau staff that they have a suitable environment in which to serve the remainder of their sentence in a home setting. In

---

[18] Courts around the country have recently received challenges to detention on the grounds of COVID-19 in the criminal bail context and have recognized the government's public health efforts, particularly the efforts of the Bureau of Prisons, to address the COVID-19 crisis. *See United States v. Martin*, No. 19-0140, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020); *United States v. Jefferson*, No. 19-0487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States v. Hamilton*, No. 19-0054, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *United States v. Gileno*, No. 19-0161, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020); *United States, v. Rollins*, No. 11-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) (denying motion for release from custody pending sentencing and explaining that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions above").

particular, inmates must have a home telephone so that their presence in home confinement may be confirmed by speaking to them on the telephone. Gustin Decl. ¶ 30. Plaintiff Boatright and the declarant Pleasant, however, do not yet have home telephone lines installed at the homes where they would be confined. *Id.* ¶¶ 30–40. Staff are working with Boatright and Pleasant to try to ensure that they promptly obtain telephone service at the location of their home confinement. *Id.*

While residents at Hope Village do share living quarters with a limited number of other residents, this is also true of many unincarcerated members of the community who live with roommates or family members. *See Hines v. Youssef*, No. 13-0357, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate."). Residents also eat together and typically share a table, but Hope Village has made it more possible for residents to practice social distancing during meal times by opening up a second dining room in a vacant apartment. Ex. 3, CIC Rep. Residents can also limit their close exposure to others by sitting only with the inmates with whom they share rooms. Further, the chance that an inmate at Hope Village will contract the virus from the other inmates with whom he shares living quarters is substantially reduced by the fact that residents are not currently permitted to leave the Hope Village facility and there have been no known cases of COVID-19 within Hope Village. Williams Decl. ¶ 6; Gustin Decl. ¶ 37.

Second, Plaintiffs cannot satisfy the subjective element of the analysis, which requires them to prove "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Farmer*, 511 U.S at 837). The test is

subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S at 837. To be sure, the Bureau is acutely aware of the risk that COVID-19 poses to its inmate population and to the public at large, but it can hardly be said to be indifferent, as shown by the actions to counteract the spread of COVID-19 described above. Plaintiffs contend that the Bureau has been specifically indifferent to allegedly substandard conditions at Hope Village and that the Bureau was aware of these conditions by virtue of news reports of inmate allegations published on March 25 and 26 and a letter from the Washington Lawyers' Committee for Civil Rights and Urban Affairs dated March 25. Pls.' Br. at 17–18.[19] But around the same time these news reports were published, the CIC visited Hope Village on March 26 and reported no sanitary or safety concerns. The Bureau sees no reason to doubt the accuracy of the CIC's report. Gustin Decl. ¶ 34. As the CIC report indicates that Hope Village is a safe and sanitary environment, the Bureau cannot be said to be deliberately indifferent to any known excessive risk to inmate safety. *See Farmer*, 511 U.S. at 837.

While Plaintiffs may disagree with the measures taken by the Bureau and Hope Village to protect inmate health and safety while also carrying out the Bureau's mission to effectuate criminal sentences imposed by federal courts, deliberate indifference is not shown simply by a difference of medical judgment. *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere

---

[19] Plaintiffs also refer to a letter to the Bureau from Congressional Delegate Eleanor Holmes Norton of Washington, D.C. Pls.' Br. at 18. Contrary to Plaintiffs' characterization, however, the referenced letter does not mention Hope Village. And contrary to Plaintiffs' allegations, Delegate Norton has issued a statement announcing that the Bureau "has assured her that Hope Village . . . has enough supplies for all residents and is clean and sanitary." Delegate Norton further stated, "This positive and prompt assurances from the Federal Bureau of Prisons that the residents at Hope Village are being taken care of in a safe manner, with everything they need, is reassuring to families and to D.C. residents." *See* https://norton.house.gov/media-center/press-releases/norton-receives-assurances-from-federal-bureau-of-prisons-that-hope (last visited Apr. 6, 2020).

difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation"). Further, in the midst of this extraordinary emergency, "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). Rather, public health officials are entitled to heightened deference when exercising science-based public health judgment during a public health emergency. *See, e.g.*, *United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789 (E.D.N.Y. 1963) (explaining in a habeas matter that "the judgment required is that of a public health officer and not of a lawyer used to insist on positive evidence to support action; their task is to measure risk to the public . . . . They deal in a terrible context and the consequences of mistaken indulgence can be irretrievably tragic."); *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016) ("To permit these constitutional claims to go forward . . . would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not my) expertise."); *see also Jacobson,* 197 U.S. at 39 (upholding mandatory vaccination law and explaining that such a measure, enacted to protect public health, will not be struck down unless it "has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights" secured by the Constitution); *Bragdon v. Abbot*, 524 U.S. 624, 650 (1998) (noting that "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (recognizing that "courts normally should defer to the reasonable medical judgments of public health officials").

B.      *Releasing residents from Hope Village would not redress the alleged injuries;*
        *instead, it would likely result in injury to some residents.*

Plaintiffs are also unlikely to succeed on the merits because the primary relief that they

seek from the Bureau—the release from custody of a substantial number of Hope Village residents

(or, alternatively, their own release)—is unlikely to redress the alleged harm that they or the

members of the alleged class purportedly suffer—a risk of contracting COVID-19. To bring a

claim in federal court, a plaintiff must satisfy the requirements for Article III standing: injury,

causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The

redressability requirement limits Article III jurisdiction to those cases in which the relief sought

will remedy the injury alleged. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529

U.S. 765, 771 (2000). Although certainty is not required, "the [plaintiff] must demonstrate 'that it

is likely as opposed to merely speculative that the injury will be redressed by a favorable decision

of the court.'" *Spectrum Five LLC v. FCC*, 758 F.3d 254, 260 (D.C. Cir. 2014) (citation omitted).

A plaintiff must demonstrate standing (including the redressability element) for each form of relief

sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[I]f a favorable judicial

decision is unlikely to correct the alleged wrong, there is no case or controversy within the meaning

of Article III." *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 566 (D.D.C. 2018).

Plaintiffs cannot show that the immediate release of a substantial number of Hope Village

residents or themselves would lessen their risk of them contracting COVID-19. It cannot be denied

that COVID-19 is spreading throughout the District of Columbia, though it has yet to manifest in

any way at Hope Village. As noted, the Bureau and Hope Village have taken measures to protect

the staff and residents of Hope Village, including restricting inmate's ability to come and go from

the facility, screening new arrivals for symptoms, taking measures to allow greater social

distancing during meals and in groups, cleaning high-traffic areas more frequently, and isolating

anyone showing symptoms of COVID-19. Unlike many in the community, inmates at Hope Village do not need to leave the facility to purchase groceries, toiletries, or cleaning supplies. By contrast, Plaintiffs have not provided any assurances that the places that they intend to reside or the lifestyles that they would adopt upon release from Hope Village would offer similar protections. For example, while Plaintiffs complain that they are required to share a living space and a restroom with a limited number of other residents, it is not clear that they would not be subject to the same arrangement outside the facility.

Further, while the two named Plaintiffs indicate that they have homes where they could live outside Hope Village, Williams Decl. ¶ 3, Boatright Decl. ¶ 3, they provide no indication that this is true for the many other residents that they would have this Court immediately order out of the Hope Village facility where they live. Many of those residents likely do not yet have suitable homes to go to upon their release and presently depend on Hope Village for food, shelter, and access to medical care. *See* Gustin Decl. ¶ 29 (noting that many residents at Hope Village qualify for home confinement but have not been placed on home confinement for several reasons, including that they do not have a home). These residents would certainly see their risk of contracting COVID-19 dramatically increased, not reduced, if, in the middle of a pandemic, they are forced to abandon their living quarters at Hope Village with no viable alternative.

C.       *The BOP lacks authority to unilaterally truncate judicially imposed sentences, which can only be modified by the sentencing court.*

As relief, among other things, Plaintiffs ask that this Court order the Bureau to release some unspecified number of individuals from Hope Village so that the remaining residents there can more easily practice social distancing. ECF No. 11-2. Contrary to Plaintiffs' allegation, however, the Bureau does not have the "discretion to provide early release" to federal inmates. *See* Compl. ¶ 14. Sentences are imposed by federal judges (not the Bureau), and only federal judges may

modify or reduce the terms of those sentences. Gustin Decl. ¶ 14. Upon request by an inmate, however, the Director of the Federal Bureau of Prisons may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 3582(c)(1)(A) where there are "extraordinary and compelling reasons" for doing so. This is referred to as "compassionate release." The process is generally initiated by an inmate submitting a written request to the warden of their correctional institution. Bureau Program Statement: *Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, § 571.61.a (Jan 17, 2019). An inmate may also file a motion for reduction of sentence directly to the sentencing court after exhaustion of administrative remedies, or 30 days from the date the warden receives such a request from the inmate, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). The determination of release is ultimately the decision of the sentencing court.

As far as the Bureau is aware, however, no Hope Village resident has submitted a request for compassionate release to the Bureau. Because they have yet to undertake this necessary administrative process, Plaintiffs and the other residents at Hope Village may not at this time seek to take advantage of compassionate release. In recent weeks, numerous criminal defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused. The only Court of Appeals to have addressed the question has rejected the argument and required exhaustion. *See United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020). In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion

requirement takes on added—and critical—importance." *Id.* at *2. The vast majority of district courts have also required exhaustion despite alleged COVID-19 concerns.[20]

In addition, the Bureau can temporarily furlough a prisoner to visit a designated place for a period not to exceed 30 days for the purpose of obtaining medical treatment that is not otherwise available, among other specific statutorily described reasons. *See* 18 U.S.C. § 3622. The Bureau is currently using this authority for individuals who have been medically screened, determined to by symptomatic, and on the advice of medical professionals. Gustin Decl. ¶ 15. No resident of Hope Village currently meets these criteria. *Id.*

For these reasons, the Bureau lacks any authority to release Plaintiffs or the other federal inmates at Hope Village from their judicially imposed sentences. Should Plaintiffs or anyone else wish to pursue the possibility of compassionate release, they must follow the prescribed administrative process for moving their sentencing court for a modification of their court-imposed sentence. That is not something that the Bureau can do unilaterally.

## II.    Plaintiffs have not established imminent irreparable harm.

Plaintiffs' inability to show irreparable harm presents an independent basis for denying their requested emergency relief. The D.C. Circuit "has set a high standard for irreparable injury."

---

[20] *See United States v. Hernandez*, No. 18-0834, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18-0602, 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020); *United States v. Carver*, No. 19-6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark*, No. 17-0085, 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Williams*, No. 15-0646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); *United States v. Garza*, No. 18-1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Zywotko*, No. 19-0113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Eberhart*, No. 13-0313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gileno*, No. 19-0161, 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020). *But see United States v. Perez*, No. 17-0513, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 19-0179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020). Both *Perez* and *Colvin* relied on *Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019), which is inapposite because it involves judge-made exhaustion doctrine

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The party

seeking injunctive relief must show that its injury is "both certain and great," and that it is "actual

and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It

is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" allegation

of harm cannot constitute "irreparable harm" sufficient to justify injunctive relief. *Id.* Moreover,

the movant "'must demonstrate a causal connection between the alleged harm and the actions to

be enjoined; a preliminary injunction will not issue unless it will remedy the alleged injuries.'"

*Navistar, Inc. v. EPA*, 2011 WL 3743732, at *2 (D.D.C. Aug. 25, 2011) (quoting *Hunter Grp. v.

Smith*, 164 F.3d 624 (4th Cir. 1998)). Because plaintiffs have not made the requisite showing of a

nonspeculative injury that could be remedied by any lawful order from this Court, the motion

should be denied on this basis alone. *Cf. Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't

of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) (noting that if one requirement is

not met then "there is no need to consider the remaining factors").

Moreover, any lawful order that might be issued from this Court would not actually remedy

the harm alleged. The purpose of emergency injunctive relief is "to prevent irreparable harm" that

is "actual" and "imminent." *League of Women Voters*, 838 F.3d at 7. It follows that when *granting*

such relief could not and would not actually prevent the harm that the movant seeks to avoid,

emergency injunctive relief is inappropriate. As Judge Bates once put it, "[i]t would make little

sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought

would not actually remedy that harm. A plaintiff may be irreparably harmed by all sorts of things,

but the irreparable harm considered by the court must be caused by the conduct in dispute *and*

remedied by the relief sought." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153

(D.D.C. 2011) (emphasis added); *see also Winter*, 555 U.S. at 20 ("A plaintiff seeking a

preliminary injunction must establish . . . that he is likely to suffer irreparable harm *in the absence of* preliminary relief."); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 207 (D.D.C. 2014) ("[T]he inability to obtain redress from an order by this Court . . . likewise dooms the plaintiff's ability to show irreparable harm."), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

For substantially the same reasons that Plaintiffs cannot show redressability, they cannot show an actual irreparable injury. As there are and have been no known cases of COVID-19 at Hope Village, Plaintiffs do not presently suffer an "actual" threat of contracting the disease. Further, the Bureau and the facility are taking appropriate measures under the circumstances to ensure that COVID-19 is not introduced to the facility. Where inmates have shown symptoms of the disease, they have been promptly isolated (and ultimately tested negative). Plaintiffs cannot show that they would be less at risk of contracting COVID-19 in the community—where the disease is quickly spreading—than at Hope Village. In addition, Plaintiffs Thurman and Boatright, who are 49 and 36, respectively, have provided no information from which to conclude that they are at a high risk for serious complications from COVID-19. For these independent reasons, Plaintiffs' motion for a temporary restraining order should be denied.

## III.   Public health and safety would not be served by granting the requested preliminary relief.

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Once again, plaintiffs have not met their burden. Plaintiffs ask the Court to order the Bureau to release and remove from Hope Village an unspecified but presumably substantial number of inmates so that the remaining residents will not have to share living space and can more easily practice social distancing. As noted, many of these

inmates may not have viable housing options outside of Hope Village and, if asked to immediately leave the facility, would be suddenly deprived of access to food, means of personal hygiene, and medical care during a time when these basic necessities are all the more critical.[21] Not only would this risk those inmates becoming infected with COVID-19, it would also risk those individuals transmitting the disease to others in the community, thereby undermining the substantial public efforts to suppress the spread of the virus. Clearly, this would not be in the interest of public health and safety.

**IV.    Plaintiffs have not provided a sufficient basis for preliminary class certification, and class-wide relief would likely harm many Hope Village residents.**

Plaintiffs seek provisional class certification for purposes of their temporary restraining order, contending that "the propriety of class treatment here is apparent." Pls.' Br. at 29.[22] It is not. "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To certify a class under Rule 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

There are four requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation, Fed. R. Civ. P. 23(a), and it is Plaintiffs' burden to prove that each element is met, *see Harris v. Koenig*, 271 F.R.D. 383, 388 (D.D.C. 2010) ("The plaintiff bears the burden of proof on each element of Rule 23." (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S.

---

[21] The CDC emphasizes that people who are homeless are particularly vulnerable to COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/index.html (last visited Apr. 4, 2020).

[22] Plaintiffs have also filed a full motion for class certification. ECF No. 25. Defendants' response to that motion is currently due on April 17, 2020, and the Bureau will respond more fulsomely to Plaintiffs' arguments at that time.

591, 614 (1997))). Plaintiffs fall short. They claim to satisfy the numerosity requirement only by lumping together all "prisoners who are detained or will be detained at Hope Village." Pls.' Mot. for Class Cert. at 4. So construed, however, the class cannot satisfy the remaining elements. A class satisfies the commonality requirement where there is a uniform "policy or practice that affects all class members." *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013). And the typicality requirement is satisfied if the claims "are based on the same legal theory." *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003). But Plaintiffs' proposed class would combine inmates who are in the custody of the D.C. Department of Corrections and subject to that agency's policies and practices, as well as inmates who are in the custody of the Federal Bureau of Prisons and subject to the statutes and policies governing it.

Most strikingly, Plaintiffs' cannot show adequacy of representation. To do so, they must demonstrate that "(1) the named representative must not have antagonistic or competing interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575–76 (D.C. Cir. 1997) (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)). Plaintiffs here demand a dramatic remedy that would have a profound effect on members of the class: the immediate release and removal of a substantial portion of the population at Hope Village. Plaintiffs are two inmates with homes that they could go to upon release, but they provide no assurances that other class members (including those that would have to be released to effectuate their requested injunction) are similarly situated. Indeed, it is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is having a substantial impact on the District of Columbia. Plaintiffs' failure to consider or account

for such concerns in the immediate and sweeping relief that they seek demonstrates that they are

not fit to represent the members of their proposed class.

## CONCLUSION

Plaintiffs have not satisfied their heavy burden for the sweeping emergency injunctive

relief that they seek. The Court should deny their motion for a temporary restraining order.


Dated: April 6, 2020                                Respectfully submitted,

                                                    TIMOTHY J. SHEA, D.C. Bar #437437
                                                    United States Attorney

                                                    DANIEL F. VAN HORN, D.C. Bar #924092
                                                    Chief, Civil Division

                                                    By:   /s/ Johnny Walker
                                                    JOHNNY H. WALKER, D.C. Bar #991325
                                                    Assistant United States Attorney
                                                    555 4th Street, N.W.
                                                    Washington, District of Columbia 20530
                                                    Telephone: 202 252 2575
                                                    Email: johnny.walker@usdoj.gov

                                                    *Counsel for Defendants*
                                                    *the Federal Bureau of Prisons and*
                                                    *the Director of the Federal Bureau of Prisons*