UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THURMAN WILLIAMS and<br><br>RONALD IAN BOATRIGHT<br><br>each individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>FEDERAL BUREAU OF PRISONS<br><br>MICHAEL CARVAJAL, in his official capacity as Director, Federal Bureau of Prisons<br><br>DISTRICT OF COLUMBIA<br><br>QUINCY BOOTH, in his official capacity as Director, D.C. Department of Corrections<br><br>HOPE VILLAGE, INC.,<br><br>          DEFENDANTS. | Civil No.     1:20-cv-00890-RC |

**REPLY IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER**

The Court now has four extensive memoranda of law concerning a timely legal question and novel facts surrounding a global pandemic. Having reviewed the filings submitted less than a day before a hearing in this matter, and in an effort to provide the Court with Plaintiffs' understanding of the contentions that Defendants assert as fact, Plaintiffs submit this short reply brief in advance of today's hearing.

In summary, Defendants assure the Court they have the situation under control. They do not. Several *undisputed* facts belie this contention:

- The Center for Disease Control and other public health experts have advised that the best method for limiting the transmission of the virus is to avoid gatherings and practice "social distancing." Experts recommend a minimum of six feet between people, limited contact, and meticulous personal hygiene. *See, e.g.* Dkt. No. 5-1 at ¶ 9-11; BOP Opp. at 7-8.[1] To combat the disease, the Bureau of Prisons (BOP) and Department of Corrections (DOC) recommend mandatory quarantines.

- Contrary to this guidance, prisoners held at Hope Village are unable to engage in effective social distancing. Prisoners share two-bedroom apartments. Each bedroom holds up to four prisoners, who sleep in bunk beds roughly three feet from one another. Up to eight men share a single bathroom. *See* Dkt. No. 30-1 at ¶ 34; Dkt. No. 5-2 at ¶ 4-5; Dkt. No. 5-3 at ¶ 5.

- Prisoners eat together in dining areas with 20 to 25 other people. *See* Dkt. No. 5-1 ¶ 31; Dkt. No. 30-1 at ¶ 32; Dkt. No. 29-4 at ¶ 3 Five men sit around round tables that are approximately five feet in diameter. *See* Dkt. No. 29-4 at 3. The dining area has no sink in which men can wash their hands prior to eating. *See* Dkt. No. 30-1 at ¶ 19; Dkt. No. 5-4 at ¶ 14. Hand sanitizer is not available to prisoners. Dkt. No. 30-1 at ¶ 14.

- Though BOP "instructed facilities to implement regular daily temperature testing and screening for COVID-19 symptoms for all residents and staff," BOP Opp. at 10, 15; "Hope Village is unable to conduct temperature screening at this time" because it does not currently have no-touch thermometers. Hope Village Opp. at 35; Dkt. No. 30-1 at ¶ 6. This includes temperature screenings of staff who travel in and out of the facility each day. *Id.* ¶ 4.

- There is no professional cleaning staff at Hope Village. All apartments and common spaces are cleaned by prisoners. Dkt. No. 30-1 at ¶ 23.

- There is no medical staff on site. *Id.* at ¶ 10.

Thus, the core allegations concerning conditions at Hope Village are now admitted by the Chief Executive Officer of Hope Village, Mr. Varone: Crowded, communal living with limited protection from coronavirus is the rule at Hope Village. Only an immediate and dramatic reduction in the population size can remedy this situation. A substantially smaller population will alleviate

---

[1] Three memoranda of law were filed in opposition to the Complaint and motions for a temporary restraining order and for a preliminary injunction. The Department of Corrections memorandum ("DOC Opp.") is available at Docket No. 28. The Bureau of Prisons memorandum ("BOP Opp.") is available at Docket No. 29. The memorandum of Hope Village ("Hope Village Opp.") is available at Docket No. 30.

crowding, permitting Hope Village to assign one resident to one apartment for those who remain, and dining in small groups or individual apartments. Importantly, none of the Defendants appears to dispute the Court's inherent authority to order the reduction in population now.

The Defendants' responses are legalistic and misrepresent the relief sought by Plaintiffs. First, they point fingers at each other and cite contract clauses, memoranda circulated by the BOP, and regulations. But this is not the time for "bi-weekly" reviews of home detention (Dkt. No. 29-1 at ¶ 31), annual visits (Dkt. No. 29-1 at ¶ 32), adherence to minimum contractual requirements (Dkt. No. 30-1 at ¶¶10, 15, 34), 20th-century landline requirements (*Id.* at ¶ 35), or squabbles among the Defendants about who is responsible. *See, e.g. Id.* at ¶¶ 42, 45.

Defendant BOP also misrepresents the relief Plaintiffs are seeking. Plaintiffs are not in the first instance seeking the release of all residents of Hope Village, which Defendant BOP suggests would make many people homeless and deprive them of necessary services. *See* BOP Opp. at 26-27. This is a red herring. Plaintiffs are seeking an order requiring Defendants to "release enough people such that the remaining residents can be housed safely and in compliance with CDC guidance at Hope Village." Dkt. No 12 at 3. This can be done by releasing those who have homes to go to, and reconfiguring the living situation at Hope Village for those who do not, so that appropriate anti-pandemic protocols can be followed.

In a press release Monday night, the BOP claimed to be "aggressively" screening inmates in correctional institutions for home confinement. *See* Ex. 1. It makes even more sense to do so here, where most prisoners are already eligible for home confinement. Individuals held at Hope Village came and went freely from the facility for work and other reasons prior to March 20, and most are due to be released from confinement imminently as their sentences end. Those with homes to go to should be sent there. In fact, Attorney General Barr's guidance of March 26, 2020

directs BOP to prioritize the use of home confinement and mandates that "priority [be] given to inmates residing in low and minimum security facilities." Ex. 2. Here, BOP admits that "***124 of the 196***" BOP prisoners at Hope Village "***are statutory eligible for home confinement***." Dkt. No. 29-1 at ¶ 29 (emphasis added). Yet Defendants are keeping individuals at Hope Village without proper screening or social distancing measures in place, posing a severe and unnecessary risk to their health, and safety.

The relief sought by the Plaintiffs will not only protect prisoners, but is necessary to protect staff and to avoid an outbreak that will overwhelm the District's health care system. With no medical facilities on site, infected prisoners will be treated at local hospitals. As of April 5, 2020, the District has only 69 intensive care beds and 255 available ventilators across the entire city.[2] The rapid spread of the virus at Hope Village will dramatically tax an already strained health care network.

Finally, Defendants wrongly urge the Court to hold Plaintiffs to a stricter standard for a "mandatory injunction," but the D.C. Circuit has "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). Nevertheless, Plaintiffs have met their burden as to each factor, and the Court should enter the requested Order.

    **A.**    *The First Element.*  **Success on the Merits is Likely Because Defendants Overstate the Findings of the CIC Report**

All Defendants rely heavily on a brief Corrections Information Council (CIC) report in an attempt to definitively state that conditions at Hope Village are adequate to respond to and mitigate the COVID-19 threat. Hope Village Opp. at 24-25 (stating that CIC's "thorough review" of Hope

---

[2] https://coronavirus.dc.gov/page/hospital-status-data

Village found that "Hope Village had fully met each point of concern in its preparations for the COVID-19 pandemic"); BOP Opp. at 17 ("CIC…reported no sanitary or safety concerns. The Bureau sees no reason to doubt the accuracy of the CIC's report"); DOC Opp. at 19 (stating that the CIC report "demonstrates that the District has met its obligation to ensure that Hope Village" is properly addressing safety concerns.). This reliance is misguided and overstated. Defendants mischaracterize both the scope and findings of the CIC investigation.

The CIC report is outdated, limited in its scope, and largely confirms the core allegations of Plaintiffs' Complaint. CIC's investigative findings are based on a visit that took place on March 26, 2020 – over ten days ago. Cases of COVID-19 have increased nearly fivefold in Washington, D.C., over a dozen prisoners at the D.C. Jail have been diagnosed with the virus, and federal, state, and local facilities across the country have seen widespread outbreaks of COVID-19. *See* Dkt. No. 5 at 5-6. In addition, Hope Village did not allow its residents to speak with investigators about conditions in the facility. *See* Dkt. No. 29-4 at 1 (stating that CIC staff "w[ere] not permitted to conduct individual interviews with current residents"). Instead, CIC based its report on a conversation with Hope Village staff and a BOP Residential Re-Entry Manager (via telephone), and a walk through of the facility's dining, food, and supply storage areas. *Id.* The report includes no indication that CIC investigators were permitted to enter living quarters, bedrooms, bathrooms, or other common spaces in the facility. Simply put, the CIC Report did not take into account the realities of the crowded and unhygienic conditions in the facility.

Even with these limitations, nothing included in the CIC report negates the undisputed facts stated above. To the contrary, the CIC report either fails to address (in the case of the living facilities) or confirms (in the case of the dining facilities) Plaintiffs' allegations that Hope Village has failed to create an environment for social distancing. *See id.* at 3 (finding that "approximately

20-25 people are eating in each [of the two] space[s] at a given time. This would mean five people to each of five or six round tables in each space. Each table is approximately 5 feet in diameter."). The report does not address the fact that prisoners currently sleep in rooms with up to three others, in bunkbeds approximately three-feet apart, because CIC investigators did not enter living facilities. Dkt. No. 30-1 at ¶ 34; Dkt. No. 5-2 at ¶ 4; Dkt. No. 5-3 at ¶ 5. It does not refute Plaintiffs' claims regarding conditions in the dining hall, where residents have no opportunity to wash their hands prior to eating, after they walk down communal hallways and touch communal surfaces. Dkt. No. 30-1 at ¶ 19; Dkt. No. 5-4 at ¶ 14. It does not address the fact that staff is traveling in and out of the facility without proper screening procedures in place and that new residents enter Hope Village without any temperature screening or quarantine. The report provides no information on the frequency of cleanings, or the fact that residents are required to clean all common and personal spaces themselves. Hope Village Opp. at 35; Dkt. No. 30-1 at ¶ 6. Simply stated, the CIC report by no means vindicates Defendants.

Finally, Defendant BOP relies on the CIC report to claim that Hope Village is "screening all incoming inmates (including temperature and symptom checks)" and therefore operating consistent with BOP guidance that "facilities should implement regular daily temperature testing." BOP Opp. at 10.[3]    This is wrong, and it underscores BOP's total indifference to the facts and conditions at Hope Village. According to Hope Village, "Hope Village is unable to conduct temperature screening at this time" because it does not currently have no-touch thermometers. Hope Village Opp. at 35; Dkt. No. 30-1 at ¶ 6.

---

[3] BOP claims that the CIC report concluded that Hope Village was conducting temperature and symptom checks of incoming residents. The report states that "[i]individuals being released from BOP institutions are being screened for Covid-19 per BOP's current policy on transfers (including temperature and symptoms check)." BOP Opp. at 10. The report did not state that Hope Village was itself conducting such screenings on those entering the facility.

### B. *The Second Element*.  Even the Attorney General Recognizes Irreparable Harm That Outweighs BOP's Objections

BOP argues that Plaintiffs are not entitled to home confinement because "inmates must have a home telephone so that their presence in home confinement may be confirmed by speaking to them on the telephone," and that Plaintiffs "do not yet have home telephone lines installed at the homes where they would be confined." BOP Opp. at 16.  First, Mr. Boatright has a landline.  Ex. 3; Boatright Decl. ¶ 3.  Counsel for Mr. Boatright will provide the telephone number to the Court during the hearing to avoid disclosing a private landline in a public filing.  Second, contending that a landline is a prerequisite to implementing home confinement policies contradicts the very exception created by the Attorney General of the United States just this past Friday, when he strenuously instructed the BOP to implement a home confinement policy for residents of halfway houses and stated: "I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community.  I therefore authorize BOP to transfer inmates to home confinement *even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.*" Ex. 5 at 2 (emphasis added).  Similarly, BOP claims that Mr. Williams is not eligible for home release because he "has not provided a release plan." Dkt. No. 29-1 at ¶ 38.  This is incorrect, as Mr. Williams has a home to go to once he is released.  *See* Dkt. 5-2 at ¶ 3.

In addition to incorrectly representing that they cannot release Messrs. Boatright, Williams, and Pleasant, BOP contends that Hope Village has adequately prepared for protecting residents from COVID-19.  BOP Opp. at 16-17 ("Hope Village has made it more possible for residents to practice social distancing during meal times by opening up a second dining room in a vacant apartment.").  This is, quite simply, not the case.  The second dining area the BOP references has

not improved the ability to social distance. Ex. 3; Boatright Decl. ¶ 5. The "dining area" is half of an apartment living room with five or six tables at which four people may sit in close proximity. Ex. 3; Boatright Decl. ¶ 5. These tables are about 1.5 feet apart and are closer together than their typical dining area. Ex. 3; Boatright Decl. ¶ 5. Even in spreading out the dining schedule, there are 40 or 50 residents in this space at any given time because they have to line up to wait their turn in the dining area and the line becomes backed up because people take their time to eat. Ex. 3; Boatright Decl. ¶ 5 . Furthermore, residents are still responsible for getting their own hygiene and cleaning supplies. Ex. 3; Boatright Decl. ¶ 7. Mr. Boatright has been screened neither leaving the BOP nor upon admission to Hope Village. Ex. 3; Boatright Decl. ¶ 9. BOP faces a daunting task; however, it has guidance from the Attorney General, which it is failing to follow.

The logic and sense of the relief sought by the plaintiffs has been recognized by courts and public officials across the Nation. Scores of courts have taken action, including: in South Carolina all prisoners held in jail on bond in a non-capital case were ordered to be released, unless there exists an "unreasonable danger" or "extreme flight risk.[4] in New Jersey all prisoners serving county jail sentences were ordered released;[5] and in Massachusetts the Supreme Court ruled that pre-trial detainees not charged with certain violent offenses, as well as incarcerated individuals held on technical probation and parole violations, are entitled to a rebuttable presumption of release.[6]

---

[4] *In the Matter of the Request to Commute or Suspend County Jail Sentences*, No. 082430 (N.J. Mar. 22, 2020), https://www.njcourts.gov/notices/2020/n200323a.pdf?c=9cs.  The order provided a mechanism for prosecutors, within 24 to 48 hours, object to the release of specific prisoners who "would pose a significant risk to the safety of the inmate or the public," with such objections to be considered by judges or special masters appointed by the Supreme Court.

[5] Memorandum from Donald W. Beatty, Chief Justice of South Carolina Supreme Court, to Magistrates, Municipal Judges, and Summary Court Staff (Mar. 16, 2020), https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461.

[6] *See* Deborah Becker, *Mass. High Court Rules Some Prisoners Will Be Eligible For Release Due To COVID-19*, WBUR News (Apr. 3, 2020), https://www.wbur.org/news/2020/04/03/sjc-prisoners-emergency-petition-ruling.

### C. *The Third Element.* The Relief Requested Outweighs Any Harm to Defendants.

BOP and Hope Village claim that Plaintiffs' request for relief is to release all Hope Village residents, including those who do not have a home, further putting them at risk for contracting COVID-19. *See, e.g.,* BOP Opp. at 20. Plaintiffs misconstrue the relief. Plaintiffs request as seeking immediate release of *all* residents of Hope Village. Rather, Plaintiffs requested that Defendants release Plaintiffs and any other residents who have homes to go to in order to reduce the overall population of Hope Village, while providing strenuous yet necessary cleaning and hygiene strictures inside the facility for those who remain. Dkt. No. 9-1 at ¶ 103.

While maintaining these conditions should include releasing residents who are eligible for home confinement to reduce the population at risk of contracting COVID-19 in Hope Village, housing fewer people in the facility creates a better opportunity for Defendants to properly implement social distancing practices at Hope Village. Complying with guidelines also includes providing sanitary and cleaning products, ensuring food safety, and conducting daily COVID-19 screenings for staff and any persons entering the facility. If Defendants are unable to improve the conditions at Hope Village, then Defendants need to make other arrangements for all residents to ensure their safety.

Instead, Defendants brazenly claim that Plaintiffs have an increased risk of contracting COVID-19 if they are with their family, rather than living in a facility that houses 70 people in one building, sleeps six men to a bedroom where their beds are three feet apart, and feeds thirty men at a time in a cramped cafeteria. Not so. *See, e.g.*, Giftos Decl. ¶ 15 (stating that "[c]orrectional settings increase the risk of contracting an infectious disease like COVID-19…"). Plaintiffs are requesting that Defendants follow their own guidelines and guidance and release those residents who are able and eligible to enter home confinement. Plaintiffs simply seek the Court to compel Defendants to act. To date, they have not Accordingly, Plaintiffs' proposed order suggests the appointment of a monitor.

### D. *The Fourth Element.* The Public Interest Favors a Temporary Restraining Order

Defendants state that the balance of equities and public interest do not support equitable relief because their release would create more risk for the general public. BOP Opp. at 24-25. By releasing Plaintiffs to home confinement, where they will not be interacting with the general public, this Court would be allowing Plaintiffs to socially distance and practice the guidelines set by the CDC. Rather than create a breeding ground for a mass infection of COVID-19 in the population of approximately 200 residents of Hope Village residents, Plaintiffs may stay separated from others within the confines of their own homes. Furthermore, Plaintiffs do not seek a class-wide release from confinement at Hope Village; rather, they seek home confinement for the maximum possible number determined by BOP, in accordance with the guidance issued by the Attorney General this past Friday. The remaining residents request living conditions that maximize avoidance of exposure to COVID-19, most objectively determined by a monitor.

The Court would not be creating new policy by granting Plaintiffs equitable relief; in fact, it would be aligning completely with executive and legislative guidance on the issue. Specifically, doing so would align with the Attorney General's guidance to the BOP of this past Friday, April 3, 2020, regarding the dire nature of COVID-19 and the need to allow for home confinement, as well as the most updated press release from the District's Congresswoman, Eleanor Holmes Norton, describing the need for home confinement. *See* Exs. 4 & 5. Importantly, Hope Village provides the Court with a citation and discussion of Congresswoman Holmes Norton's press release from last week stating that conditions were acceptable at the halfway house. But the Congresswoman's position change in such a short time—calling now for an investigation into Hope Village and home confinement—exemplifies the dire nature of the virus and the need to act with haste. On the question of what is and is not in the public interest, the Court has the benefit of both the executive branch and the voice of the citizenry for the District of Columbia in Congress calling for home confinement where possible, and preventative living conditions in the event residents are required to stay. Plaintiffs request this remedy as well—no more, no less—but seek

the Court's help with expediting the process in the face of an obstinate complement of Defendants and a global pandemic.

## CONCLUSION

For the reasons discussed, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order.

Dated: April 7, 2020

                                        Respectfully submitted,
                                        /s/ Kevin Metz

Kevin Metz (D.C. Bar # 494087)
Drew Wisniewski (D.C. Bar # 1016351)
(admission pending)
Clayton LaForge (D.C. Bar # 1033938)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW
Washington, DC  20004
Tel:  (202) 637-2200
kevin.metz@lw.com
drew.wisniewski@lw.com
clayton.laforge@lw.com

Jonathan Smith (D.C. Bar # 396578)
Emily Gunston (D.C. Bar # 1032056)
Lyndsay A. Niles (D.C. Bar # 1003427
**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS**
11 Dupont Circle, NW, Suite 400
Washington, DC 20036

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar # 1601047)
**ACLU FOUNDATION OF THE DISTRICT OF COLUMBIA**
915 Fifteenth Street NW, Second Floor

11

Washington, DC 20005
Tele: (202) 457-0800
artspitzer@gmail.com
smichelman@acludc.org
mperloff@acludc.org

*Attorneys for Plaintiffs*