## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THURMAN WILLIAMS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL BUREAU OF PRISONS, *et al.*, <br><br> *Defendants*. | Civil Action No. 20-0890 (RC) |

## DISTRICT DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs Thurman Williams and Ronald Boatright seek a preliminary injunction against Quincy Booth, Director of the District of Columbia Department of Corrections (DOC), and the District of Columbia (collectively, the District), as well as against defendants Federal Bureau of Prisons (BOP), BOP Director Michael Carvajal, and Hope Village, Inc. (Hope Village). Plaintiffs allege that conditions inside Hope Village, a halfway house in which they are serving court-ordered sentences, violate their rights under the Eighth Amendment and warrant a preliminary injunction amid the COVID-19 pandemic.

Plaintiffs cannot make the requisite showing for emergency injunctive relief against the District because they cannot show a likelihood of success on the merits. First, both Mr. Williams and Mr. Boatright remain in BOP custody in a privately-managed facility. Therefore, both plaintiffs lack standing to bring a claim against the

District, particularly as they seek relief on behalf of others who, unlike them, are in DOC custody. Second, plaintiffs have not established deliberate indifference on the part of District officials, where the evidence shows that the District has engaged in appropriate oversight to address the risks posed by the pandemic. And third, plaintiffs have not pled or otherwise shown facts sufficient to establish municipal liability. Moreover, plaintiffs have not shown the other requirements for preliminary injunctive relief: a likelihood of irreparable harm absent immediate relief, or that the balance of the equities and the public interest weigh in their favor. Plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

### I.    COVID-19 in the District of Columbia

On March 7, 2020, officials announced the District's first confirmed case of COVID-19, an infectious respiratory illness caused by the novel coronavirus that has spread rapidly across the globe since its first detection in humans in late 2019. *See* Press Release, Gov't of the District of Columbia, DC Department of Health Confirms First Coronavirus Case (March 7, 2020), available at https://coronavirus.dc.gov/ release/dc-department-health-confirms-first-coronavirus-case; D.C. Health, COVID-19 FAQs, available at https://coronavirus.dc.gov/node/1464356. Although the virus's sufferers have exhibited a range of symptoms, severe cases have been known to cause shortness of breath, pneumonia and even death. *Id.* The World Health Organization (WHO) has declared the spread of COVID-19 a global pandemic. *See* "WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020,"

World Health Organization, March 11, 2020, available at https://www.who.int/ dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

Municipalities across the country have hastened to respond to COVID-19's unprecedented spread in just a few short weeks. Since early March 2020, U.S. cities and states have ordered the closure of schools and non-essential businesses, banned large gatherings and recommended that individuals who do not live in the same household abide by now-familiar "social distancing" measures where feasible. *See, e.g.*, Jesse McKinley and Michael Gold, *Ban on Large Gatherings in N.Y. as Coronavirus Cases Rise Sharply*, N.Y. Times, March 12, 2020, available at https://www.nytimes.com/2020/03/12/nyregion/coronavirus-nyc-event-ban.html; Dominic Fracassa, *SF Bans Large Gatherings as Nation Moves to Confront Pandemic*, San Francisco Chronicle, March 11, 2020, available at https://www.sfchronicle.com/bayarea/article/Mayor-London-Breed-bans-all-large-gatherings-15123312.php.

The District is no exception. On February 28, 2020, more than a week before the District recorded its first case of COVID-19, Mayor Muriel Bowser issued an order preemptively activating the District's Emergency Operations Center and requiring all District agencies to ensure they had up-to-date plans for emergency operations. *See* Mayor's Order 2020-035, February 28, 2020, available at https:// dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/2020-035-District-Government-Preparation-for-the-Coronavirus-COVID-19.pdf.

While the District prepared in earnest, events unfolded quickly. By March 11, 2020, Mayor Bowser issued a Declaration of Public Emergency and a Declaration of Public Health Emergency based on the WHO declaration of a pandemic, as well as on the outbreaks seen in other cities throughout the world. *See* Mayor's Order 2020-045, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/ mayormb/release_content/attachments/MO.DeclarationofPublicEmergency03.11.20. pdf; Mayor's Order 2020-046, March 11, 2020, available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachment s/MO.DeclarationofPublicHealthEmergency03.11.20.pdf. Both Declarations have since been extended through at least May 15, 2020, and the District is now under a stay-at-home order. *See* Mayor's Order 2020–054, March 30, 2020, available at https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order; Press Release, Gov't of the District of Columbia, Mayor Bowser Extends Public Health Emergency, Stay at Home Order, and Closure of Non-Essential Businesses Through May 15 (April 15, 2020), available at https://mayor.dc.gov/release/mayor-bowser-extends-public-health-emergency-stay-home-order-and-closure-non-essential. This case arises in the context of an unprecedented response to an unprecedented situation.

II.     <u>DOC's Role and Authority</u>

DOC is the agency charged with safely and securely housing pretrial detainees, those serving sentences for misdemeanor offenses, and those adjudicated guilty but awaiting sentencing for offenses in the District. DOC is responsible for ensuring "the safekeeping, care, protection, instruction, and discipline of all persons committed to

[its] institutions." D.C. Code § 24–211.02(a). The agency also plays an important role in ensuring the safety of those inside and outside its facilities. *See, e.g.*, 28 DCMR § 500.3 (permitting DOC to take individuals charged with criminal violations into involuntary protective custody who are "found to be in danger from a clear and present threat to that resident's safety"); *Id.* § 507.10 (allowing DOC to withhold from residents information "which may endanger any resident(s) or other person(s), or cause a riot, other major disturbance, or damage to property"); *Teamsters Local Union 1714 v. Pub. Emp. Relations Bd.*, 579 A.2d 706, 712 (D.C. 1990) (observing DOC employees "are involved directly with public safety").

DOC operates a system consisting of two District-run correctional facilities and three halfway houses run by private contractors into which it places certain persons in its custody. *See* D.C. Department of Corrections, "Correctional Facilities," available at https://doc.dc.gov/page/correctional-facilities. Hope Village is one of those halfway houses. In total, Hope Village housed approximately 300 individuals at the time plaintiffs filed their Complaint. *See* Pls.' Mem. in Support of Mot. for TRO and Prelim. Inj. (Pls.' Mem.) [13] at 9. The number of individuals housed at Hope Village has since decreased, as reflected in the Court-ordered daily census reports filed under seal by defendant Hope Village. *See* Order Denying TRO [35] at 2. The overwhelming majority of these individuals are in the custody of BOP, which independently contracts with Hope Village to provide services for certain individuals in federal custody. *See* Compl. [9] ¶¶ 30, 34. Of the 20 individuals in DOC custody residing at Hope Village when the Complaint was filed, only 14 residents remain, all of whom

are pretrial defendants detained pursuant to court order.[1] *See* Supplemental Declaration of Renee Alexander (Alexander Supp. Decl.), Ex. 1, ¶ 2.

Regardless of the facility in which a pretrial detainee in DOC custody resides, DOC has no legal authority to release pretrial detainees, including the 14 Hope Village residents under its custody. *See generally* D.C. Code §§ 24-211.02; 24-211.02a. DOC also does not have the legal authority to unilaterally release sentenced individuals from its custody. To the extent DOC has the authority to award good-time credits to sentenced misdemeanants to facilitate their early release, that has already been done. *See* Press Release, Gov't of the District of Columbia, Mayor Bowser Grants Early Release to Several Residents Held in the DC Jail (April 10, 2020), available at https://mayor.dc.gov/release/mayor-bowser-grants-early-release-several-residents-held-dc-jail (announcing application of 75 good time credits to render 36 individuals serving misdemeanor sentences in CDF eligible for immediate release). In addition, the Superior Court has continued all criminal sentencings as of March 18, 2020. *See* Order, Superior Court of the District of Columbia (March 18, 2020), at 2, available at https://www.dccourts.gov/sites/default/files/matters-docs/General%20Order%20pdf/Order-3-18-20-Final.pdf (continuing indefinitely all matters other than four specified categories). Thus, no new individuals serving sentences in DOC custody will be entering Hope Village.

---

[1]    At the time plaintiffs filed their Complaint, DOC had 19 court-ordered pretrial defendants residing at Hope Village and one individual serving a misdemeanor sentence; that sentenced misdemeanant has since been released. Alexander Supp. Decl. ¶ 2.

### III.    DOC's Contract with Hope Village

The District has contracted with Hope Village for many years to provide services to designated adult males in DOC custody.[2] Declaration of Renee Alexander (Alexander Decl.) [28-1] ¶ 5. The District's current contract with Hope Village (the Contract) was executed in 2014 and through a series of extensions would have remained in effect through the end of April 2020.[3] *Id.* ¶ 6. The Contract provides that Hope Village "shall provide housing for sentenced misdemeanants and court ordered commitments referred by the D.C. Courts for the transitioning from incarceration to productive community living [and for] establishment/re-establishment of employment pending their eventual release from custody." Hope Village Contract (Contract), Ex. 2 at 9. The Contract specifies that the District "will screen all potential referrals and send them to [Hope Village] from the District's Correctional Facilities," though Hope Village may return a resident to his DOC facility of origin if the "resident's behavior becomes unmanageable." *Id.* at 21.

The Contract specifies basic conditions of residents' living arrangements that Hope Village must provide, including "a minimum of sixty (60) square feet of individualized and secure bedroom space," "a means for residents to launder their personal clothing," and "bed linens and towels on a weekly basis" for no charge. *Id.* at

---

[2]    All individuals in DOC custody at Hope Village are men; DOC has contracted with a separate halfway house, Fairview, to house women. *See* Alexander Decl. ¶ 3.

[3]    DOC's contract with Hope Village was previously extended to the end of May 2020, but on April 14, 2020, Hope Village announced it will close on April 30, 2020. *See* Alexander Decl. ¶ 3.

15. The Contract also requires Hope Village to meet various conditions for safety, sanitation, and environmental health specified by District and federal law, including providing new residents with "personal hygiene articles … such as[] soap, tooth paste [sic] tooth powder or denture cleanser, toilet paper, sanitary napkins, deodorant and shaving equipment" at no cost. *See id.* at 15–16. Hope Village must provide residents with free meals and ensure all food service complies with District and federal law. *Id.* at 18–19. In addition, Hope Village must provide each resident "access to medical services," including transportation to obtain required treatment. *Id.* at 22.

## IV.    The District's Oversight and Hope Village Site Inspections

To ensure that Hope Village remains in compliance with the Contract, DOC inspects Hope Village approximately once a month. *See* Alexander Decl. ¶ 8. If conditions are not up to the standards required under the Contract, DOC alerts Hope Village and requires remedial action.[4] *Id.*

Since the COVID-19 outbreak began, DOC officials have been in daily contact with Hope Village to monitor its contractual compliance. *Id.* ¶ 11. The DOC's Office of Community Corrections (OCC) conducted a site visit to Hope Village on March 26, 2020, to investigate claims that residents had fallen ill and that the facility lacked a sufficient supply of personal hygiene and cleaning products. *See* COVID-19 Hope

---

[4]    In exceptional cases, DOC could terminate the Contract as defaulted. Alexander Decl. ¶ 9. If that were to happen, the judge who assigned each DOC pretrial resident to Hope Village would determine where to place that resident; DOC would transfer those serving misdemeanor sentences to either the Central Detention Facility (CDF) or Correctional Treatment Facility (CTF) to finish their sentences. *Id.*

Village Investigation Report (OCC Report), Attachment A to Ex. 1 at 1. In that visit, however, OCC officials found "that Hope Village is in compliance with hygiene and cleaning products for staff and residents," citing evidence—confirmed by photographs taken during the inspection—of "large quantities of cleaning products, toilet paper, paper towels, soap, food, and snacks." *Id.*; Alexander Decl. ¶ 13. Officials observed that "Hope Village also had large quantities of masks and gloves for staff and residents." OCC Report at 2; Alexander Decl. ¶ 13. Officials found that one Hope Village resident was tested for COVID-19 based on flu-like symptoms, but the test came back negative; he was assigned to an apartment by himself out of an abundance of caution.[5] *Id.* As of DOC's March 26, 2020 site visit, there were "[n]o other residents who have complained of flu-like symptoms." *Id.*

Hope Village implemented several other precautions. Residents and staff were given COVID-19 information "via a Resident Meeting and staff meeting" in which "[p]recautions, symptoms and social distancing were discussed." *Id.* To give residents ample space to practice social distancing during meals, Hope Village converted an empty apartment living room area into additional dining space for residents. *Id.*; Alexander Decl. ¶ 13. DOC found that Hope Village had begun taking additional precautions in response to individual resident concerns. Ultimately OCC "left with the impression that the allegations noted regarding lack of supplies, food etc. were

---

[5]      Under the Court's April 7, 2020 Order denying plaintiffs' motion for a temporary restraining order, defendant Hope Village is filing under seal a daily census that includes updated numbers for individuals tested for COVID-19 and the test results. *See* Order Denying TRO [35] at 2. As of April 15, 2020, those census reports have not revealed any positive COVID-19 tests.

false and Hope Village has more than adequate supplies to keep staff and residents safe during the COVID-19 Pandemic." *Id.*; Alexander Decl. ¶ 14. DOC officials nevertheless issued a number of recommendations for how Hope Village could improve its precautions against COVID-19 and has continued to urge that additional appropriate precautions be taken. OCC Report at 3; Alexander Decl. ¶ 14.

The District of Columbia Corrections Information Council (CIC) independently conducted its own site visit to Hope Village on March 26, 2020, and published its findings to the public. *See* DC Corrections Information Council, "RE: CIC Visit to Hope Village on Thursday, March 26, 2020" (CIC Report), available at https://cic.dc.gov/sites/default/files/dc/sites/cic/release_content/attachments/Now%20 Hope%20Village%20CIC%20Statement%203_27_20%20-compressed.pdf. The CIC is "an independent monitoring body mandated by the US Congress and the DC Council to inspect, monitor, and report on the conditions of confinement at facilities where DC residents are incarcerated." DC Corrections Information Council, "About the DC Corrections Information Council," available at https://cic.dc.gov/page/about-cic; *see* D.C. Code § 24-101.01.[6]

CIC observed that as of its visit, three residents had been tested for COVID-19; two tested negative, and one still awaited results. *Id.* at 1. No staff had been tested because "there were no concerns about staff health." *Id.* CIC found Hope Village to

---

[6]    CIC is governed by an Executive Director appointed by the Mayor and a three-member board consisting of one member appointed by the Mayor with the advice and consent of the D.C. Council, and the other two appointed directly by the D.C. Council. *See* D.C. Code § 24–101.01(b)(2)(A), (b)(3).

have "an adequate supply of hygiene and cleaning products for staff and residents," noting that its conclusion was independent of DOC's similar finding. *Id.* at 4. Residents had access to "cleaning supplies including disinfectant" for their use "at any time," and each resident had their own bar of soap. *Id.* at 5. Hope Village was still conducting programs such as "drug treatment and transitional skills journaling" but had begun conducting them in smaller groups to facilitate social distancing. *Id.* at 6. Mental health services continued to be provided, and residents could go outside "for 30 minutes at a time to get fresh air." *Id.*

## V.    Plaintiffs' Allegations

Plaintiffs are two individuals currently residing at Hope Village in BOP custody. Plaintiff Williams was transferred to Hope Village from Federal Correctional Institution–Schuylkill, Compl. ¶ 25, and plaintiff Boatright was transferred from Federal Correctional Institution–Sheridan, *id.* ¶ 28. Plaintiffs have brought this lawsuit against BOP, BOP Director Michael Carvajal (in his official capacity), the District, DOC Director Quincy Booth (in his official capacity), and Hope Village. *Id.* ¶¶ 30–34.

Plaintiffs' Complaint presents a number of general allegations about Hope Village's response to COVID-19. Plaintiffs allege that the conditions in Hope Village "disregard all medical and public health directives for risk mitigation," and that Hope Village "does not encourage or practice social distancing in its facilities." *Id.* ¶ 40. In addition, plaintiffs allege deficiencies in COVID-19 screening, *id.* ¶¶ 43–44, the provision of ample space to practice social distancing, *id.* ¶ 46, and the provision of

hygienic and cleaning supplies, *id.* ¶¶ 48–55. Plaintiffs also allege that residents have not received access to on-site medical care or information about mitigating COVID-19 risk. *Id.* ¶¶ 62–64. Plaintiffs allege that this has occurred despite BOP guidance instructing private facilities on how to prevent the spread of COVID-19. *Id.* ¶¶ 71–73.

Although plaintiffs raise three claims for relief, the only claim against the District is an Eighth Amendment claim under 42 U.S.C. § 1983. This claim simply asserts, in conclusory fashion: "By failing to provide adequate conditions in the midst of a global health pandemic, Defendant District of Columbia has violated Plaintiffs' Eighth Amendment rights …." *Id.* ¶¶ 94–96; *see id.* ¶ 90 ("The Eighth Amendment guarantees post-conviction detainees the right to reasonable safety."). Plaintiffs also seek to certify a class consisting of "[a]ll persons who were, as of the filing date of the complaint in this case, or will be in the future, confined in Hope Village." *Id.* ¶ 87. As relief, plaintiffs seek a declaration that the conditions at Hope Village "place Plaintiffs at an unreasonable risk of contracting serious illness." *Id.* ¶ 102. They seek injunctive relief in the form of seven changes in the operations at Hope Village, *id.* ¶ 103, a writ of habeas corpus ordering "the immediate release of Plaintiffs and sufficient members of the Plaintiff Class to ensure that the remaining residents can effectively practice social distancing and safe sanitation measures," *id.* ¶ 104, an order for "all Defendants to immediately release Plaintiffs," *id.* ¶ 105, and any other relief deemed "just and equitable," *id.* ¶ 107.

## VI.  Procedural History

Plaintiffs filed their lawsuit on April 2, 2020. *See* Compl. [1]. Along with the Complaint, plaintiffs filed a motion for a temporary restraining order (TRO) and a motion for preliminary injunction. *See* Mot. for Temporary Restraining Order [3]; Mot. for Preliminary Injunction [4].

On April 7, 2020, the Court held a telephonic hearing regarding plaintiffs' motion for a TRO and denied the motion based on plaintiffs' failure to show a likelihood of success on the merits. *See* Order Denying TRO [35] at 1. The Court also ordered:  (1) defendant Hope Village to file a daily census of the facility's overall population, the number of individuals who have been tested for COVID-19, and the results of those tests; (2) defendant Federal Bureau of Prisons to "file a daily notice with the number of home confinement requests for individuals at Hope Village that are pending as well as the number of said requests that it has granted"; and (3) defendant Hope Village to submit a roster with information regarding each resident's age, medical conditions, sentencing information, and other information relevant to the issues presented. *Id.* at 2. A telephonic hearing on plaintiffs' motion for a preliminary injunction will occur on April 17, 2020. *Id.*

## LEGAL STANDARD

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The same standards apply for both temporary restraining

orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

A plaintiff seeking a preliminary injunction must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Sherley*, 644 F.3d at 392. Because injunctive relief is an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013); *Winter*, 555 U.S. at 22. The plaintiff bears the burden of doing so. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

## ARGUMENT

I. <u>As Individuals in BOP Custody in a Private Residential Facility, Plaintiffs Are Unlikely To Succeed on the Merits Because They Lack Standing To Seek Relief Against the District.</u>

Plaintiffs have not carried their burden to show they are likely to succeed on the merits of their case against the District, and that alone is fatal to their motion. Demonstrating a likelihood of success on the merits is a free-standing requirement. *Sherley*, 644 F.3d at 393 (internal quotation marks omitted). Failing to meet the burden on this prong "is alone sufficient to defeat" a motion for emergency injunctive relief. *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). The Court need not conclude that plaintiffs will definitely lose on the merits, only that they have not met the demanding burden of showing a clear entitlement to immediate, extraordinary relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48

(D.D.C. 2013). To overcome this burden, plaintiffs must show not merely that success is a "possibility" but that it is "likely." *Winter*, 555 U.S. at 20–22. Plaintiffs have not shown a likelihood of success on the merits against the District.

As an initial matter, plaintiffs cannot succeed on the merits because they lack standing to seek relief from the District. Every plaintiff in federal court must meet the constitutional minimum for Article III standing by showing an injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs fail to show causation or redressability as to the District.

To meet the causation element of standing, a plaintiff must have an injury "that is fairly traceable to the challenged action of the defendant." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). The plaintiff must initially allege—and later show—"the crucial causal connection tying" the plaintiffs' injury to the defendant's actions "rather than to some other factor." *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009). "[T]he more attenuated the causal link, the less substantial the likelihood that a judicial ruling against the defendants will in fact redress the plaintiff's injury." *Brady Campaign to prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 77 (D.D.C. 2004).

The two named plaintiffs lack standing for a straightforward reason:  They are not in the District's custody and cannot seek relief on behalf of others who are. In other words, the District has caused plaintiffs no legally cognizable harm.  However, plaintiffs incorrectly rely on a second, novel theory of standing:  The District is

allegedly subjecting them to unconstitutional conditions of confinement by housing other persons at Hope Village, adding to the "crowding" and making it difficult to practice social distancing. *See* Pls.' Mem. at 15. At the outset of this litigation, only 20 individuals in DOC custody were housed at Hope Village, out of a total of about 300 residents, and now only 14 remain. *See* Alexander Supp. Decl. ¶ 2. If the existing resident population does not permit adequate social distancing, it is unlikely this was caused by the presence of the small number of residents in the District's custody. Because the plaintiffs' alleged injuries are not fairly traceable to the District, plaintiffs cannot meet the causation requirement of standing.

Plaintiffs also fail to establish redressability. Redressability requires showing "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[T]he burden lies on the Plaintiffs to show that jurisdiction is proper as to the claims against each defendant …." *Gem Cnty. Mosquito Abatement Dist. v. E.P.A.*, 398 F. Supp. 2d 1, 7 n.5 (D.D.C. 2005).

In particular, a plaintiff lacks standing to seek relief from any defendant who cannot provide the specific relief the plaintiff seeks. *See Justice v. Kuhnapfel*, 985 F. Supp. 2d 334, 337 (E.D.N.Y. 2013) (plaintiff could not seek injunction against state court and government officials to retain custody of child where "[b]oth the Court and

Defendants lack the power to return [the child] to Plaintiff"); *Mayo Clinic v. Elkin*, Civil Action No. 09–322, 2010 WL 5421322, at *3 (D. Minn. Dec. 27, 2010) (quoting *Toth v. United Auto. Aerospace & Agr. Implement Workers of Am.*, 743 F.2d 398, 404 (6th Cir. 1984)) ("A plaintiff may only obtain recovery from 'a person or entity whose actions may be causally linked to the alleged injury, and from whom relief or remedy is possible.'"); *Cerilli v. Cay*, Civil Action No. 14–1551, 2015 WL 4603460, at *2 (D. Conn. Jul. 29, 2015) (plaintiff could not seek injunction against correctional facility custodial staff seeking changes to current medical treatment since "[t]his request … cannot be satisfied by the defendants, who are not medical staff and are located at different correctional facilities"). That is precisely the case here regarding the District.

To begin, plaintiffs have asked for a variety of injunctive relief measures, most of which would require Hope Village to adjust aspects of the living conditions inside the facility. *See* Compl. ¶ 103. Because the District is unable to make these changes directly, there is no relief the District can provide. *See Cerilli*, 2015 WL 4603460, at *2.[7]

Plaintiffs also seek a writ of habeas corpus or an injunction releasing them and others from Hope Village. *See* Compl. ¶¶ 104–105. The two plaintiffs, however, are not in the custody of the District. *See* Compl. ¶¶ 25, 28 (stating that plaintiffs were transferred to Hope Village from federal correctional institutions). The District is

---

[7]    The District cannot be vicariously liable. *See* Section III below.

without authority to release them.[8] And although plaintiffs filed this case as a putative class action, "there is no class of plaintiffs before the Court at this time towards whom relief could be directed." *Russell v. Barry*, Civil Action No. 87–2072, 1987 WL 15697, at *2 (D.D.C. Jul. 30, 1987). To the extent plaintiffs seek the release of others, this Court should not grant relief to parties not before it. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."); *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 205 n.4 (D.D.C. 2018) ("[I]t is not clear that the Court can or should issue class-wide injunctive relief without a certified class."); *Dorfmann v. Boozer*, 414 F.2d 1168, 1171 n.8 (D.C. Cir. 1969) (preliminary injunction "should not have been issued before the action was certified as a class action" where injunction "worked a transfer of money belonging to persons who were not within the jurisdiction of the court").

Furthermore, plaintiffs' lack of standing to bring an Eighth Amendment claim against the District makes it inappropriate to even provisionally certify a class of "all

---

[8]    To the extent plaintiffs seek their release or the release of others through a writ of habeas corpus, they must seek that relief from the DOC Warden, who is not named as a defendant in this case. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[I]n habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not … some other remote supervisory official."). "[T]here is generally only one proper respondent to a given prisoner's habeas petition," namely, "'the person' with the ability to produce the prisoner's body before the habeas court." *Id.* at 434–35 (quoting 28 U.S.C. § 2242). *See also Stokes v. United States Parole Comm'n*, 374 F.3d 1235, 1238 (D.C. Cir. 2004) (limitation of habeas relief to the one individual holding the petitioner in custody is "inflexible").

current and future residents of Hope Village," *see* Pls.' Proposed Prelim. Inj. Order [4–1] ¶ 1. The Hope Village residents currently in the District's custody are pretrial defendants and the Eighth Amendment does not apply to pretrial detainees.[9] *See* Alexander Supp. Decl. ¶ 2; *See Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 153 (D.D.C. 2007) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979)) (dismissing plaintiff's Eighth Amendment claim because "as a pretrial detainee, [he] had no Eighth Amendment rights that could have been violated"); *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 187 (D.D.C. 2009) (same).

Here, because no plaintiff or member of the putative class who is in the District's custody is presently confined to Hope Village following a conviction, no plaintiff or putative class member has standing to bring an Eighth Amendment claim against the District. *See* Alexander Supp. Decl. ¶ 2. Provisionally certifying a class that includes individuals in DOC custody would be inappropriate because it would defeat the typicality requirement under Rule 23 that the "named plaintiffs' claims [be] based on the same legal theory as the claims of the other class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003); Fed. R. Civ. P. 23(a).[10] That showing is not possible here because the named plaintiffs and putative class members

---

[9]    Because there are no Hope Village residents in the District's custody who are sentenced misdemeanants, and no showing that such individuals will soon become residents, there is no basis to consider the claims of hypothetical future residents in this category.

[10]    As noted above, plaintiffs moved for class certification [35], and the District will address class certification in full in its forthcoming opposition to plaintiffs' motion.

in DOC's custody do not have the same legal claims regarding alleged Eighth Amendment violations.

To the extent plaintiffs request that the District release as many people as possible so that the remaining residents at Hope Village can practice social distancing, DOC has no power to unilaterally release anyone in its custody. *See* D.C. Code §§ 24-211.02; 24-211.02a. DOC only has the authority granted to it by the COVID-19 Response Emergency Amendment Act of 2020[11]—which permits DOC to increase sentencing credits for those serving misdemeanor sentences. *See* D.C. Code § 24–221.01c(c) (2020). Even if DOC had the authority to release pretrial detainees, it is unlikely that plaintiffs' concerns about adequate space will be rectified by the removal of 14 residents when the total resident population at Hope Village remains in the hundreds.

Plaintiffs cannot show causation or redressability and are therefore unable to demonstrate they have standing to seek any relief from the District. Without standing to seek relief, they cannot show a likelihood of success on the merits of their claim.

## II.    Plaintiffs Are Unlikely To Succeed on the Merits Because They Cannot Show the District Acted with Deliberate Indifference.

Even if they had standing and the Eighth Amendment applied to the District here, plaintiffs fail to establish that the District violated the Eighth Amendment by subjecting them to constitutionally inadequate conditions of confinement. To

---

[11]    *See* D.C. Act 23-247, March 17, 2020, available at http://lims.dccouncil.us/Download/44469/B23-0718-SignedAct.pdf.

establish an Eighth Amendment violation of this kind, plaintiffs must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Here, plaintiffs cannot show that the District acted with "deliberate indifference" toward the risks posed by the COVID-19 pandemic.

To show deliberate indifference under these circumstances, plaintiffs must "allege that officials had subjective knowledge of [a] serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligence is insufficient to show deliberate indifference. *Brown*, 514 F.3d at 1283. The test is a subjective one: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

DOC does not dispute the gravity of COVID-19 or its duty to ensure the well-being of individuals in its custody at Hope Village. *See* D.C. Code § 24–211.02(a). But plaintiffs are simply incorrect that the District has not taken meaningful steps to address the risks posed by the pandemic. *See* Pls.' Mem. at 17–19. On the contrary, the record demonstrates that DOC investigated the conditions at Hope Village by conducting a site visit on March 26, 2020, at which it "found that Hope Village is in compliance with hygiene and cleaning products for staff and residents." *See*

Alexander Decl. ¶ 14. These findings were confirmed by CIC, an independent monitoring body, which conducted its own site visit on March 26, 2020. *See* CIC Report at 4. The record demonstrates that the District has met its obligation to ensure that Hope Village is in compliance with the Contract and is taking appropriate actions to address any health and safety concerns brought to its attention. *See* OCC Report at 2; Contract at 15–16 (stating Hope Village's obligation to provide adequate health and safety amenities); *id.* at 22 (requiring Hope Village to ensure residents' access to medical care). Furthermore, since the outbreak, DOC officials have been in daily contact with Hope Village to monitor its contractual compliance. Alexander Decl. ¶ 11. The District has conducted active oversight of the health and safety of Hope Village's actions to ensure the safety of its residents during the pandemic. Any assertion that the District has shown deliberate indifference to the risks posed by COVID-19 is belied by the facts.

As part of the deliberate indifference inquiry, courts should consider "the constraints facing the official[s]" for context. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *see Helling v. McKinney*, 509 U.S. 25, 37 (1993) ("The inquiry into [deliberate indifference] also would be an appropriate vehicle to consider arguments regarding the realities of prison administration."). Here, the significant constraints on housing those in DOC custody and the measures the District has ensured Hope Village is taking (in spite of those constraints) preclude a finding of deliberate indifference. *See Hines v. Youssef*, Civil Action No. 13-00357, 2015 WL 164215, at *5 (E.D. Cal. Jan. 13, 2015) (finding no deliberate indifference when "Plaintiff has failed to show that

the policy Plaintiff contends should have been adopted was within the range of policies that the proposed Defendants could reasonably have promulgated."). For example, Hope Village is designed for residents to live in shared spaces. *See* Contract at 15. To adhere as closely as possible to social distancing recommendations, Hope Village has made more space available for meals and offered private rooms for individuals who show symptoms of an illness. Alexander Decl. ¶ 13. Additionally, group sessions—for drug treatment and skills building—are being conducted in smaller groups with residents siting several seats apart. *Id.* ¶ 6.

The rapidly changing nature of public health recommendations is also significant. When applying the deliberate indifference standard, the relevant official's state of mind "must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017); *see Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (Section 1983 complaint against prison doctor properly dismissed where "hindsight suggests that [his] treatment decisions may have been mistaken, even gravely so"). In its oversight of Hope Village, the District has reacted to new information swiftly and recommended policies aimed at limiting COVID-19's potential harm to residents based on the best available knowledge. *See* OCC Report at 3; Alexander Decl. ¶ 14. As noted, the District performs monthly inspections of Hope Village and quickly arranged an additional visit to the site in light of the pandemic to ensure Hope Village was taking adequate measures. Alexander Decl. ¶ 8. Additionally, DOC has increased its monitoring of Hope Village's compliance with the Contract since the COVID-19

outbreak, including daily contact with Hope Village to discuss the status of the residents' safety and measures taken to mitigate the risk. *Id.* ¶ 11. These measures show that the District's oversight of the conditions at Hope Village have evolved with new information and ensures that Hope Village continues to have the best available information for updating its policies and keeping pace with the changing informational landscape. Plaintiffs cannot show they are entitled to a preliminary injunction without showing it is "likely," and not merely "possible," that their claims will succeed. *Winter*, 555 U.S. at 20–22. Because they have not done so with respect to their allegation against the District of deliberate indifference, their motion for a preliminary injunction should be denied.

## III.  Plaintiffs Are Unlikely To Succeed Against the District Because They Cannot Establish Municipal Liability Under Section 1983.

In addition, plaintiffs have not alleged any facts as to the District's liability under Section 1983.[12] Municipal liability under Section 1983 cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (*quoting Monell*, 436 U.S. at 691).

---

[12]  Plaintiffs named DOC Director Booth as a defendant in his official capacity, but the claim against him duplicates the claim brought against the District. It is well settled that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

The D.C. Circuit has identified four ways official municipal policy can be demonstrated: (1) "the explicit setting of a policy by the government that violates the Constitution;" (2) "the action of a policy maker within the government"; (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'"; and (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *See Baker*, 326 F.3d at 1306–07 (citations omitted). Each theory has its own "elements," which a Section 1983 plaintiff bears the burden of pleading. *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015); *accord Hodges v. District of Columbia*, 975 F. Supp. 2d 33, 54 (D.D.C. 2013) ("The fact that [a] claim arises under section 1983 does not relieve [plaintiff] of the obligation to satisfy the criteria established in *Iqbal* and *Twombly*.").

Plaintiffs have alleged no theory that their Eighth Amendment claim against the District arises from a municipal policy. Nor could they—as discussed above, the District acted diligently to ensure that Hope Village was responding appropriately to the COVID-19 outbreak. *See* Section II above. The deficiencies plaintiffs allege in Hope Village's COVID-19 response do not implicate the conduct of District policymakers, and plaintiffs have not articulated any theory of municipal liability or established any of its elements. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988) (city not liable where former municipal employee failed to "contend that anyone in city government ever promulgated, or even articulated" an

"unconstitutional municipal policy"); *Blue*, 811 F.3d at 20 ("If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine … whether the plaintiff had provided plausible support for her claim. Although the court could try to surmise which theory of municipal liability has the strongest support in the complaint, this is not [the court's] role").

## IV.  Plaintiffs Have Not Shown That the Remaining Preliminary Injunction Factors Weigh in Their Favor.

Aside from the merits of plaintiffs' claims, "failure to demonstrate irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors … merit such relief." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citation and internal quotation marks omitted); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (observing that there is "a high standard for irreparable injury"). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court should deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

To date, there have been no confirmed cases of COVID-19 in Hope Village, *see* Alexander Decl. ¶ 13, and efforts are underway to minimize the risk that virus transmission occurs. *See* Section III above. Plaintiffs have not shown that they will

suffer imminent harm absent an order requiring the release of Hope Village residents in DOC's custody because, as noted above, there are no individuals in DOC custody serving a misdemeanor sentence residing at Hope Village at this time, nor will there be in the near future. *See* Background Section II, above (all sentenced misdemeanants released from DOC custody; all Superior Court criminal sentencings continued). Plaintiffs fail to meet their burden of demonstrating irreparable harm.

Even if plaintiffs could show a likelihood of success on the merits and that irreparable harm would result without a preliminary injunction, they must additionally show both that "the balance of equities tips in their favor," and that "an injunction is in the public interest." *Sherley*, 644 F.3d at 392; *In re Navy Chaplaincy*, 738 F.3d at 428 (plaintiffs cannot use strong showing on some factors to make up for weak showing on others). These two factors "merge when the Government is the opposing party" and are thus analyzed together. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (citation and internal quotation marks omitted). "[W]here the Court has a less intrusive means" of ensuring legal compliance, "the public interest would weigh towards choosing such options, especially where … the plaintiffs seek a mandatory ('do this') rather than prohibitory ('don't do this') injunction." *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 160 (D.D.C. 2018).

DOC recognizes the gravity of COVID-19 and its duty to ensure the well-being of its 14 residents at Hope Village who are detained pretrial by court order. However, requiring DOC to release those residents—even assuming it had such authority—

would pose a substantial risk to public safety and present an unwarranted intrusion into the agency's operations. There is a well-established public interest in permitting the government to carry out its authorized functions where doing otherwise would needlessly upend its operations. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (finding lower court could have reasonably concluded that ordering redrawing of electoral district map would have contravened public interest where "injunction might have worked a needlessly chaotic and disruptive effect upon the electoral process" (citation and internal quotation marks omitted)); *Garnett*, 313 F. Supp. 3d at 160 (public interest "would disfavor the Court's interference" in legal process of administering food stamp benefits "in light of [federal agency's] expertise and role" in carrying it out). "Maintaining safety and order at [correctional] institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012). This is especially true in the midst of a public health emergency. The balance of the equities and the public interest weigh in DOC's favor and counsel against granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for a preliminary injunction against the District.

Dated: April 16, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Micah Bluming*
MICAH BLUMING [1618961]
PAMELA DISNEY [1601225]
Assistant Attorneys General
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-7272
(202) 730-1833 (fax)
micah.bluming@dc.gov
pamela.disney@dc.gov
andy.saindon@dc.gov

*Counsel for the District of Columbia and Quincy Booth*